# EXHIBIT 1

Sheila N. Swaroop (SBN 203,476)
Sheila.Swaroop@knobbe.com
Sean M. Murray (SBN 213,655)
Sean.Murray@knobbe.com
William O. Adams (SBN 259,001)
William.Adams@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 Main Street, Fourteenth Floor
Irvine, CA  92614
Phone: (949) 760-0404, Facsimile: (949) 760-9502

Nicholas A. Belair (SBN 295,380)
Nicholas.Belair@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
333 Bush Street, 21st Floor
San Francisco, CA 94104
Phone: (415) 954-4111, Facsimile: (415) 954-4111

Alexander Zeng (SBN 317,234)
Alexander.Zeng@knobbe.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
1925 Century Park East, Suite 600
Los Angeles, CA 90067
Phone: (310) 551-3450, Facsimile: (310) 551-3458

Attorneys for Defendant,
Balt USA, LLC

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| MICROVENTION, INC., <br><br> Plaintiff, <br><br> v. <br><br> BALT USA, LLC, <br><br> Defendant. <br><br> _____ <br><br> AND RELATED COUNTERCLAIMS | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

No. 8:19CV01335-JLS (KESx)

**BALT'S OPPOSITION TO PLAINTIFF'S *DAUBERT* MOTION TO EXCLUDE OPINIONS AND TESTIMONY OF JEFFREY KINRICH**

Date:        July 22, 2022
Time:       10:30 a.m.
Ctrm:       8A

Honorable Josephine L. Staton

Pretrial Conference: Nov. 18, 2022
Trial date: Pending

REDACTED VERSION OF DOCUMENT
PROPOSED TO BE FILED UNDER SEAL

# TABLE OF CONTENTS

Page No.

I.  INTRODUCTION .................................................................................1

II.  LEGAL STANDARDS .........................................................................1

III.  ARGUMENT .......................................................................................3

    A.  The Court Should Not Exclude Testimony On The Highly Relevant License Agreement Between Microtransform And MVI ...............................................................3

        1.  MVI Was Not "Sandbagged" By Its Own License Agreement ..........................................................................3

        2.  MVI's Criticisms Of Kinrich's Opinion On Comparability Should Be Addressed Through Cross-Examination Rather Than Exclusion ....................5

            a.  Kinrich Analyzed Economic Comparability ..........5

            b.  Any Weaknesses In Kinrich's Comparability Analysis Would Go To Weight Rather Than Admissibility ........................7

            c.  MVI's Case law Is Inapposite ..............................12

    B.  The Court Should Not Exclude Testimony On The Highly Relevant Noninfringing Alternative That Balt Is Currently Selling ...............................................................14

    C.  The Court Should Not Exclude Testimony On The Costs Balt Incurred In Developing The Redesigned Optima .............18

    D.  Mr. Kinrich Did Not Opine On Technical Issues, But Relied On Balt's Technical Experts ...........................................20

    E.  MVI's Motion To Limit Kinrich To His Report Is Unnecessary, Premature And Based On A Misreading Of Kinrich's Report ...............................................................20

    F.  MVI's Argument That Kinrich Should Be Barred From Testifying On Economic Comparability Is Redundant Of Its Earlier Arguments ...............................................................22

    G.  Kinrich Should Not Be Precluded From Critiquing Kennedy's Distortion Of The Royalty Base And Unsupported Assumptions .......................................................22

IV.  CONCLUSION ..................................................................................25

# TABLE OF AUTHORITIES

Page No(s).

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ........................................................... *passim*

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
738 F.3d 960 (9th Cir. 2013) ......................................................................2

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ............................................10, 17, 19, 21

*Apple Inc. v. Samsung Elecs. Co.*,
2016 WL 524904 (N.D. Cal. Feb. 10, 2016) ...........................................16

*Carucel Invs., L.P. v. Novatel Wireless, Inc.*,
2017 WL 1215838 (S.D. Cal. Apr. 3, 2017) .................................8, 10, 12

*Colibri Heart Valve LLC v. Medtronic CoreValve LLC*,
2021 WL 7285995 (C.D. Cal. Nov. 16, 2021) ........................................13

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014) ............................................................19

*DataQuill Ltd. v. High Tech Computer Co.*,
887 F. Supp. 2d 999 (S.D. Cal. 2011) ....................................................13

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) ....................................................................... *passim*

*Ecolab USA Inc. v. Diversey, Inc.*,
2015 WL 2345264 (D. Minn. May 14, 2015) .........................................12

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
312 F. Supp. 3d 830 (C.D. Cal. 2018) .....................................................25

*Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys., LLC*,
927 F.3d 1292 (Fed. Cir. 2019) ........................................................13, 14

*Elsayed Mukhtar v. Cal. State Univ., Hayward*,
299 F.3d 1053 (9th Cir. 2002) ...................................................................2

*Ergotron, Inc. v. Rubbermaid Commercial Prods., LLC*
2012 WL 3733578 (D. Minn. Aug. 28, 2012) .........................................19

*Ericsson, Inc. v. D–Link Sys., Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) .................................................................8

**TABLE OF AUTHORITIES**
*(cont'd)*

Page No(s).

*Finjan, Inc. v. Secure Computing Corp.*,
  626 F.3d 1197 (Fed. Cir. 2010) ..........................................................13, 14

*Fiskars, Inc. v. Hunt Mfg. Co.*,
  279 F.3d 1378 (Fed. Cir. 2002) .................................................................17

*Glaukos Corp. v. Ivantis, Inc.*,
  2020 WL 10-501852 (C.D. Cal. July 23, 2020).......................................13

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999)......................................................15, 16, 18

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) ......................................................................8

*Intel Corp. v. Tela Innovations, Inc.*,
  2021 WL 1222622 (N.D. Cal. Feb. 11, 2021)...........................................13

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ......................................................................................2

*Mars, Inc. v. Coin Acceptors, Inc.*,
  527 F.3d 1359 (Fed. Cir. 2008) .................................................................19

*Messick v. Novartis Pharms. Corp.*,
  747 F.3d 1193 (9th Cir. 2014)......................................................................2

*Micro Chem., Inc. v. Lextron, Inc.*,
  318 F.3d 1119 (Fed. Cir. 2003) .................................................................16

*Odyssey Wireless, Inc. v. Apple Inc.*,
  2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) ..........................................10

*Open Text S.A. v. Box, Inc.*,
  2015 WL 393858 (N.D. Cal. Jan. 29, 2015) .............................................19

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
  2019 WL 8138163 (C.D. Cal. Nov. 20, 2019).....................................12, 13

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  875 F.3d 1369 (Fed. Cir. 2017) .................................................................16

*Primiano v. Cook*,
  598 F.3d 558 (9th Cir. 2010) ........................................................................2

# TABLE OF AUTHORITIES
### *(cont'd)*

**Page No(s).**

*Radware, Ltd. v. F5 Networks, Inc.*,
  2016 WL 590121 (N.D. Cal. Feb. 13, 2016).................................17, 18, 19

*Sportspower Ltd. v. Crowntec Fitness Mfg. Ltd.*,
  2020 WL 3213704 (C.D. Cal. Feb. 3, 2020)................................................2

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015) ................................................................1

*Therasense, Inc. v. Becton, Dickinson & Co.*,
  2008 WL 2323856 (N.D. Cal. May 22, 2008) .........................17, 18, 19

*Tinnus Enterprises, LLC v. Telebrands Corp.*,
  2018 WL 6421698 (E.D. Tex. Oct. 31, 2018)..........................................15

*TVIIM, LLC v. McAfee, Inc.*,
  2015 WL 4148354 (N.D. Cal. July 9, 2015) .........................................9, 12

*Vehicle IP, LLC v. AT & T Mobility LLC*,
  227 F. Supp. 3d 319 (D. Del. 2016) .........................................................15

*Virnetx, Inc. v. Cisco Sys., Inc.*,
  767 F.3d 1308 (Fed. Cir. 2014) ..............................................8, 9, 11, 12

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
  2015 WL 12731924 (D. Del. Nov. 4, 2015) ............................................10

*Zak v. Facebook, Inc.*,
  2021 WL 4481588 (E.D. Mich. Sept. 30, 2021) .................................8, 11

*Zimmer Surgical, Inc. v. Stryker Corp.*,
  365 F. Supp. 3d 466 (D. Del. 2019) .........................................................13

*Zygo Corp. v. Wyko Corp.*,
  79 F.3d 1563 (Fed. Cir. 1996) .................................................................20

## OTHER AUTHORITIES

Fed. R. Civ. P. 26.........................................................................................20

Federal Rule of Evidence 702 .................................................................1, 2

Federal Rule of Evidence Rule 403 ............................................................18

# I. **INTRODUCTION**

In moving to exclude the testimony of Balt's rebuttal damages expert, Jeffrey Kinrich, MVI throws everything against the wall in the hope that something will stick. But none of MVI's numerous arguments has merit.

For example, MVI claims to have been surprised by Mr. Kinrich's rebuttal testimony on the Microtransform license, even though MVI itself is a party to that license, MVI produced the license to Balt in this case, and MVI's own experts addressed the license in their opening round of expert reports.

MVI also seeks to exclude testimony on MVI's license agreement with Microtransform because Mr. Kinrich allegedly ignored certain facts that show the license is not economically comparable to the hypothetical negotiation. But MVI ignores binding Federal Circuit law holding that the degree of comparability of a license, as well as any alleged failure by an expert to consider certain variables, should be addressed by cross-examination, not by exclusion.

MVI also seeks to exclude much of Mr. Kinrich's testimony because it allegedly addresses technical issues or matters outside his personal knowledge. This ignores the rule that damages experts may rely on technical experts and fact witnesses to provide the factual foundation for their opinions on damages. These arguments, and the many others in MVI's laundry list of complaints about Mr. Kinrich, are unsupported. The Court should deny MVI's motion.

# II. **LEGAL STANDARDS**

The admissibility of expert testimony in a patent case is governed by Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and the law of the regional circuit. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1294 (Fed. Cir. 2015). Rule 702 authorizes the admission of expert testimony where (1) the witness is sufficiently qualified as an expert by knowledge, skill, experience, training or education; (2) the scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (3) the testimony is based on sufficient facts or data; (4) the testimony is the product of reliable principles and methods; and (5) the expert has reliably applied the principles and methods to the facts of the case.  Fed. R. Evid. 702.  In performing the *Daubert* analysis, the court acts as a gatekeeper by "making a preliminary determination of whether the expert's testimony is reliable." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002); *see also Daubert*, 509 U.S. at 597.

The test for reliability of expert testimony is flexible and depends on the particular circumstances of the case.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).  "Under *Daubert*, the district judge is 'a gatekeeper, not a fact finder.'  When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony." *Primiano v. Cook*, 598 F.3d 558, 564-65 (9th Cir. 2010).  The issue is not the correctness of the expert's conclusions, but the soundness of the expert's methodology.  *Id.* at 564.  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Id.*  "Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969.

The district court has broad discretion to admit or exclude expert testimony.  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999) ("the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination").  However, "Rule 702 should be applied with a 'liberal thrust' favoring admission." *Messick v. Novartis Pharms. Corp.,* 747 F.3d 1193, 1196 (9th Cir. 2014).  Excluding expert testimony is "the exception rather than the rule."  *Sportspower Ltd. v. Crowntec Fitness Mfg. Ltd.*, 2020 WL 3213704, at *2 (C.D. Cal. Feb. 3, 2020) (quoting Fed. R. Evid. 702 advisory committee note to 2000 amendment).

## III. ARGUMENT

Jeffrey Kinrich is a damages expert with over thirty-five years of experience analyzing damages in patent cases and other commercial disputes. He has degrees in Mathematics and Statistics and an M.B.A. in Finance and Quantitative Methods, twice finishing first in his class. Ex. 1[1] at App'x A. Mr. Kinrich is also a CPA, and was recognized for obtaining the second highest score in the United States on the CPA examination. *Id.* Mr. Kinrich has been qualified as an expert and has testified in almost 150 trials. He has performed a reasonable-royalty analysis in dozens of patent cases.

### A. The Court Should Not Exclude Testimony On The Highly Relevant License Agreement Between Microtransform And MVI

MVI asks the Court to exclude Mr. Kinrich's testimony on its license agreement with Microtransform, Inc.[2] Dkt. 166 at 9-12 (MVI brief); Ex. 2 (agreement); Ex. 3 (restated agreement). MVI contends that Balt failed to disclose the Microtransform Agreement and that Mr. Kinrich never considered the economic comparability of the agreement. Neither contention has merit.

#### 1. MVI Was Not "Sandbagged" By Its Own License Agreement

MVI complains that, "[a]t no time prior to the service of Kinrich's expert report, did Balt ever suggest that it would be relying on a comparable license as its damages theory, let alone the Marks Agreement." Dkt. 166 at 1. MVI states that "Balt never produced any license agreements in discovery" and "never identified the Marks Agreement as a comparable license agreement." *Id.* at 10. MVI characterizes Balt's use of the agreement as "sandbagging." *Id.* at 1.

---

[1] All numbered exhibits are attached to the declaration of Nicholas A. Belair.

[2] MVI calls this agreement the "Marks Agreement." However, Microtransform, Inc. is the party that executed this agreement with MVI, and MVI's damages expert refers to the agreement as the "MicroVention / Microtransform" agreement" in his expert report. Balt will therefore refer to the agreement as the "Microtransform Agreement."

MVI turns the facts on their head. MVI was not "sandbagged" by the Microtransform Agreement – ***MVI is a party to that agreement***. Indeed, it was MVI that produced the agreement to Balt in this case. Belair Decl. ¶ 9. And it was MVI's expert, Patrick Kennedy, who first analyzed the agreement and discussed it in an expert report. *Id*. When Balt received MVI's expert report analyzing the agreement, Balt provided the agreement to its own rebuttal damages expert, Mr. Kinrich. *Id*. Mr. Kinrich analyzed the agreement and concluded, contrary to Dr. Kennedy, that MVI's prior patent license agreement is highly relevant to determining a reasonable royalty for the MVI patents asserted in this case. Ex. 1 ¶¶ 63-70. Mr. Kinrich then prepared his rebuttal expert report explaining precisely how he disagrees with Dr. Kennedy. MVI cannot credibly claim to have been surprised by a license agreement that MVI itself executed, that MVI produced in this case, and that MVI's damages expert analyzed in his opening expert report.

MVI complains that Balt did not produce comparable licenses in discovery, and never stated in its contentions or discovery responses that it intended to rely on a comparable license for damages. Dkt. 166 at 9-11. Balt did not produce comparable licenses because it was unaware – and is still unaware – of any Balt license that is comparable to the license of the hypothetical negotiation. Balt could not have produced the Microtransform Agreement because Balt was not a party to that MVI agreement and had no copy in its records. Similarly, Balt never mentioned the agreement in its contentions and discovery responses because Balt's damages expert had not yet received and analyzed the agreement and determined that it was comparable. Indeed, Balt did not even have the agreement when it served its damages contentions on April 6, 2020; MVI did not produce the agreement until June 19, 2020. Belair Decl. ¶ 9.

MVI argues that Balt should have provided a corporate witness on MVI's Topic No. 51, which relates to licenses and agreements "upon which Balt relies

to determine a reasonable royalty rate." Dkt. 166 at 10; Bystrom Decl. ¶ 6. MVI is incorrect. Balt itself had no information on any agreement relevant to damages. MVI cites no authority suggesting that Balt should have designated a corporate witness to discuss documents that Balt's outside counsel received from MVI during discovery.

MVI insists that allowing Mr. Kinrich to address the Microtransform Agreement "would be highly prejudicial to MVI," but MVI never explains how it would be prejudiced. Dkt. 166 at 10-11. MVI has always had the agreement; both sides' experts addressed the agreement in their reports; and MVI questioned Mr. Kinrich on the agreement in his deposition. MVI would suffer no prejudice if Mr. Kinrich testifies and is subject to cross-examination on this agreement.

### 2. MVI's Criticisms Of Kinrich's Opinion On Comparability Should Be Addressed Through Cross-Examination Rather Than Exclusion

MVI next argues that Mr. Kinrich should not be permitted to testify on the Microtransform Agreement because Mr. Kinrich supposedly "failed" to analyze the economic comparability of that agreement to the license of the hypothetical negotiation. Dkt. 166 at 11-12. MVI is wrong on the facts and the law. Mr. Kinrich did analyze the economic comparability of the Microtransform Agreement. And under settled Federal Circuit law, any weaknesses in that analysis go to the weight of his opinions rather than their admissibility.

#### a. Kinrich Analyzed Economic Comparability

MVI wrongly asserts that "Kinrich failed to undertake and set forth in his report any economic comparability analysis…." *Id.* at 11. In his rebuttal expert report, Mr. Kinrich responded to Dr. Kennedy's analysis of the Microtransform Agreement. Ex. 1 ¶¶ 63-70 (Kinrich report); Ex. 4 ¶¶ 105-128 (Kennedy report). Mr. Kinrich noted that the Microtransform Agreement is technologically comparable. Ex. 1 ¶¶ 63-64. Mr. Kinrich explained that Balt's technical expert,

Marc Levine, analyzed the patents licensed in the Microtransform Agreement and determined that they were "highly comparable to the Patents in Suit." *Id.* ¶ 64. Specifically, the MVI patents licensed in the Microtransform Agreement disclose ████████████████████████████████. *Id.* (citing Ex. 5 (Levine rebuttal report) ¶ 377). Even MVI's own technical expert, Dr. David Frakes, acknowledged that the Microtransform Agreement has "some general [technological] comparability." *Id.* (citing Ex. 4 (Kennedy report) ¶ 122).

After addressing technological comparability, Mr. Kinrich responded to Dr. Kennedy and explained why the agreement is economically comparable:

> 65. Under the terms of MVI/Microtransform Agreement, MVI granted to Microtransform a ████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ████████████████████ That argument is without merit; ***subsequent events (including the later amendments Dr. Kennedy carefully enumerates) have no bearing on*** ████████████████████████████ ████████████████████████████ ████████████████████
>
> 66. Further, very much like the Patents-in-Suit, the patents underlying this Agreement were ████████████████ ████████████████████████████ ████████████████████████████ ████████████████████████████ ██████████████████████

67. I note that Dr. Kennedy rejects the comparability of this Agreement in part because he has heard third-hand that the rate might have been influenced by other external factors. Not only is that at least double hearsay, but it is not the type of information a damages expert would usually rely upon. Dr. Kennedy further comments that ███████████████████████████████ That is of no relevance. ███████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████ ***The license sets a royalty rate for a clearly comparable technology*** ████████████***; it is highly relevant and should be considered.***

Ex. 1 ¶¶ 65-67 (emphasis added). Thus, Mr. Kinrich explained that the Microtransform Agreement is not just economically comparable, but highly relevant, because it ████████████████████████████████ ███████████████████████████████████ ████████████████████ MVI's assertion that Mr. Kinrich "failed to undertake … any economic comparability analysis" is incorrect.

**b.      Any Weaknesses In Kinrich's Comparability Analysis Would Go To Weight Rather Than Admissibility**

MVI next argues that Mr. Kinrich's comparability analysis should be excluded because it supposedly did not address four points of alleged dissimilarity between the Microtransform license and the parties' hypothetical license: (i) the timing of the agreement, (ii) the alleged ████████████████████ █████████████████, (iii) the alleged unimportance of the licensed patents, and (iv) the significance of ████████████████████ ████ Dkt. 166 at 12, ll. 3-14. MVI's argument ignores two fundamental principles of the governing law.

First, a patentee's prior license may be relevant to damages even if the circumstances surrounding that license differ from the parties' hypothetical license. The Federal Circuit has "never required identity of circumstances; on the contrary, we have long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330–31 (Fed. Cir. 2014) (citations and punctuation omitted). In *Virnetx*, the defendant sought to exclude testimony of the plaintiff's damages expert because the expert relied on licenses that were executed before or after the date of the hypothetical negotiation, and on a license that covered sixty-eight patents, far more than the four patents in the hypothetical license. *Id.* at 1330. The Federal Circuit ruled that, "though there were undoubtedly differences between the licenses at issue and the circumstances of the hypothetical negotiation, '[t]he jury was entitled to hear the expert testimony and decide for itself what to accept or reject.'" *Id.* at 1331 (citing *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 856 (Fed. Cir. 2010)).

Second, "[t]he degree of comparability of [prior] license agreements as well as any failure on the part of [an] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012); *see also Ericsson, Inc. v. D–Link Sys., Inc.,* 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("the fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility"); *Zak v. Facebook, Inc.*, 2021 WL 4481588, at *3 and *5 (E.D. Mich. Sept. 30, 2021); *Carucel Invs., L.P. v. Novatel Wireless, Inc.*, 2017 WL 1215838, at *8 (S.D. Cal. Apr. 3, 2017), aff'd, 730 F. App'x 938 (Fed. Cir. 2018). Each side may present expert testimony that a license is or is not comparable, and then the jury decides how much weight the license should receive. *See Virnetx*, 767 F.3d at 1330-31 ("[the] differences that Apple complains of were presented to the jury, allowing the jury to fully evaluate the

relevance of the licenses"); *TVIIM, LLC v. McAfee, Inc.*, 2015 WL 4148354, at *3-4 (N.D. Cal. July 9, 2015) ("It will be up to the jury to weigh [Defendant's expert's] opinion against that of Plaintiff's expert to determine the proper amount of damages to award…."). Thus, any alleged weaknesses in Mr. Kinrich's comparability analysis would go to the weight the jury should accord his testimony, not its admissibility. *See ActiveVideo*, 694 F.3d at 1333 (affirming the district court's denial of the defendant's *Daubert* motion despite "various weaknesses" in the plaintiff's expert's analysis of prior license agreements).

MVI's motion is not only legally unsupported – its specific criticisms of Mr. Kinrich's comparability analysis lack merit. MVI first criticizes Mr. Kinrich for not analyzing "the timing of the agreement." But Mr. Kinrich was responding to Dr. Kennedy, who never opined in his report that the Microtransform license was not comparable because of when it was executed. Ex. 4 ¶¶ 122-128 (section of Kennedy report entitled "Comparability"). Mr. Kinrich was not required to address a difference between the prior license and the hypothetical license that not even MVI's expert believes is relevant to comparability. Moreover, MVI points to no change in the ███████████████ market between the 2012 restatement[3] of the Microtransform Agreement and the 2017 hypothetical negotiation, let alone a change that could call into question the ███ royalty rate in the Microtransform Agreement. Thus, Mr. Kinrich's "failure" to address the timing of the Microtransform Agreement does not justify exclusion. *See Virnetx*, 767 F.3d at 1331 (timing differences did not warrant exclusion).

MVI's second criticism is that Mr. Kinrich failed to consider that ████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████

---

[3] The Microtransform Agreement was amended and "restated" in 2012. Ex. 3. However, the ███ royalty rate for the ███████████████ patents remained unchanged. *Cf.* Ex. 2, ¶ 3.1 *with* Ex. 3 ¶ 3.1.

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ However, MVI's mere "disagreement with the facts underlying [Kinrich's] opinion 'go[es] to the weight to be afforded the testimony and not its admissibility.'" *Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *15 (S.D. Cal. Sept. 14, 2016) (quoting *ActiveVideo*, 694 F.3d at 1333).

MVI next argues that Mr. Kinrich "fails to analyze" the alleged fact – asserted by MVI – that ████████████████████████████ ████████████ Dkt. 166 at 12, ll. 8-10. MVI claims this alleged ████████████ shows that the technology was of little economic importance. *Id.* But Mr. Kinrich did not disregard the importance of the patented technology. He relied on the opinion of Balt's technical expert, Mr. Levine, that the patents licensed in the Microtransform Agreement were "technologically highly comparable" to the asserted MVI patents because they all involved ████████████████ ████████████ Ex. 1 (Kinrich report) ¶¶ 64, 66; Ex. 5 (Levine report) ¶¶ 372-82. A damages expert may rely on a technical expert in assessing technological comparability. *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1321 (Fed. Cir. 2014), rev'd on other grounds, 792 F.3d 1339 (Fed. Cir. 2015); *Carucel*, 2017 WL 1215838, at *8; *Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *4-5 (S.D. Cal. Sept. 14, 2016); *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 2015 WL 12731924, at *6 (D. Del. Nov. 4, 2015). ████████████████

████████████████████████████████████████

████████████████████████████████████████

1  ████████████████████████████████████. MVI's claim that Mr. Kinrich
2  disregarded the importance of the patented technology is meritless.
3      Finally, MVI argues that Mr. Kinrich failed to consider "other things" in
4  the Microtransform Agreement, such as ████████████████████████████
5  ████████████████████████████████████████████████████████████
6  ████████████████████████████████████████████████████████████
7  ████████████████████████████████████████████████████████████
8  ████████████████████████████████████████████████████████████
9  ████████████████████████████████████████████████████████████
10 ████████████████████████████████████████████████████████████
11 ████████████████████████████████████████████████████████████
12 ████████████████████████████████████████████████████████████
13 ████████████████████████████████████████████████████████████
14 ████████████████████████████████████████████████████████████
15 ████████████████████████████████████████████████████████████
16 ████████████████████████████████████████████████████████████
17 ████████████████████████████████████████████████████████████
18 ████████████████████████████████████████████████████████████
19 ████████████████████████████████████████████████
20     Even if MVI were correct that the Microtransform Agreement granted
21 Microtransform additional rights beyond the patent license, Mr. Kinrich's
22 decision to disregard those additional rights would not justify excluding
23 testimony on the Microtransform Agreement. *See ActiveVideo*, 694 F.3d at 1333
24 (denying a *Daubert* motion even though the prior license "covered ActiveVideo
25 patents *and* software services yet the entire license fee was attributed to the
26 asserted patents"); *Virnetx*, 767 F.3d at 1330-31 (testimony on a prior license was
27 properly admitted although the prior license was to sixty patents and the
28 hypothetical negotiation involved only four patents); *Zak*, 2021 WL 4481588, at

*3 (the prior license involved several patent families, compared to one patent in the hypothetical negotiation); *Carucel*, 2017 WL 1215838, at *10-*11 (refusing to exclude Dr. Kennedy's testimony despite his alleged failure to account for the prior license's covenant not to sue); *TVIIM,* 2015 WL 4148354, at *4 (allowing testimony on a prior joint venture agreements); *Ecolab USA Inc. v. Diversey*, *Inc*., 2015 WL 2345264, at *14–15 (D. Minn. May 14, 2015) (denying a *Daubert* motion even though the expert "relied exclusively on the … running royalty rate and disregarded the milestone and annual minimum royalty payments terms").

In sum, MVI incorrectly argues that Mr. Kinrich failed to analyze facts important to economic comparability. But even if he had disregarded material differences between the patents licensed in the Microtransform Agreement and those licensed in the hypothetical negotiation, the "degree of comparability of the of the [Microtransform Agreement] and any failure on the part of [Balt's] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion." *ActiveVideo*, 694 F.3d at 1333. The Court should deny MVI's motion and allow the jury to hear the parties' competing expert testimony and decide for itself how much weight to accord each expert's opinion. *See Virnetx*, 767 F.3d at 1331; *TVIIM,* 2015 WL 4148354, at *3-4.

### c.  MVI's Case law Is Inapposite

None of MVI's case law supports its request to exclude Mr. Kinrich's testimony on the Microtransform Agreement. For example, in *Pavo Sols. LLC v. Kingston Tech. Co., Inc.*, 2019 WL 8138163, at *5 (C.D. Cal. Nov. 20, 2019), the expert converted a lump-sum royalty into a running royalty rate by dividing the lump-sum amount by the licensee's world-wide sales, even though the expert acknowledged that these world-wide sales numbers "could be vastly different from actual licensed sales under the settlement." In performing a similar conversion for another prior agreement, the expert used the number of the licensee's stores as a substitute for the number of licensed sales. *Id.* Here, Mr.

Kinrich engaged in no such guesswork in attributing a ███████████ rate to the Microtransform Agreement ████████████████████. Thus, *Pavo* is not pertinent. Indeed, the Central District recently distinguished *Pavo* because of its distinctive facts. *See Colibri Heart Valve LLC v. Medtronic CoreValve LLC*, 2021 WL 7285995, at *6 (C.D. Cal. Nov. 16, 2021).[4]

In *DataQuill Ltd. v. High Tech Computer Co*., 887 F.Supp.2d 999 (S.D. Cal. 2011), the expert's report had "**no analysis at all** of the economic differences between" the prior licenses and the hypothetical negotiation license. *Id.* at 1023 (emphasis added). Similarly, in *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466 (D. Del. 2019), Stryker's technical expert failed to "provide *any analysis* of [technological] comparability" and its damages expert engaged in "*no analysis* of the underlying litigation and how it may have affected the royalty rate" in the prior settlement agreement. *Id.* at 495-96 (emphasis added). And in *Glaukos Corp. v. Ivantis, Inc.*, 2020 WL 10-501852 (C.D. Cal. July 23, 2020), the expert did not even claim that the prior licenses were comparable, and his expert report contained "*no discussion* of whether the agreements [were] comparable." *Id.* at 11 (emphasis added). In contrast, Mr. Levine did analyze the Microtransform Agreement's technological comparability, and Mr. Kinrich analyzed its economic comparability. Ex. 5 ¶¶ 372-82; Ex. 1 ¶¶ 65-67.

Finally, in *Finjan, Inc. v. Secure Computing Corp*., 626 F.3d 1197 (Fed. Cir. 2010), and *Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys., LLC*, 927 F.3d 1292 (Fed. Cir. 2019), the Federal Circuit found the challenged expert testimony admissible. Indeed, the court ruled in *Finjan* that, despite "multiple differences" between the prior license and the hypothetical negotiation, the "jury

---

[4] *Intel Corp. v. Tela Innovations, Inc.*, 2021 WL 1222622, at *30-31 (N.D. Cal. Feb. 11, 2021), is similar. In considering a prior license granting world-wide rights, the court struck the expert's "alternative" calculation based on U.S. sales, but permitted the expert to calculate a royalty using world-wide sales numbers.

1    was entitled to hear the expert testimony and decide for itself what to accept or
2    reject." *Finjan*, 626 F.3d at 1212; *accord Elbit*, 927 F.3d at 1301 ("This is a case
3    in which it was up to the jury to 'weigh contradictory evidence, to judge the
4    credibility of the witnesses, and to resolve factual disputes.'") (quoting *Finjan*).
5    The same is true here.

6    **B.** **The Court Should Not Exclude Testimony On The Highly Relevant**
7    **Noninfringing Alternative That Balt Is Currently Selling**

8        Mr. Kinrich's primary reasonable royalty analysis assumes that Balt's
9    current Optima product, the redesign, was an available noninfringing alternative
10   when Balt began selling the accused Optima design. Ex. 1 ¶¶ 33-39. That Balt
11   has been selling its redesigned, noninfringing version of the Optima – *for over*
12   *ten months* – is compelling evidence that this design was available to Balt, and
13   that Balt would have paid only a small royalty for the use of MVI's patents.
14   Moreover, the ease with which Balt switched to a commercially acceptable
15   noninfringing design demonstrates that MVI's patents have minimal value.

16       MVI understandably wishes to prevent the jury from seeing this evidence.
17   MVI therefore makes multiple arguments for the exclusion of Mr. Kinrich's
18   testimony on Balt's noninfringing alternative. Dkt. 166 at 13-16. None has merit.

19       MVI first argues that Balt never disclosed "at any point prior to the receipt
20   of Kinrich's expert report" that it intended to rely on its new design as a
21   noninfringing alternative. Dkt. 166 at 13. MVI is wrong. Balt expressly stated
22   in its damages contentions that the reasonable royalty would be "minimal"
23   because of, *inter alia*, "the non-infringing alternatives and potential design-
24   arounds available to Balt at the time of the hypothetical negotiation." Ex. 6 at 6.
25   Balt also stated that it "contends that any royalty rate determined by a hypothetical
26   negotiation would not exceed the cost for Balt to implement an acceptable non-
27   infringing alternative design or to implement a design-around that does not use
28   the claimed features of the Asserted Patents." *Id.* at 9.

When Balt developed its redesigns, it promptly disclosed them. Balt produced its Rev J manufacturing procedure on June 11, 2021, three days before adopting it. Belair Decl. ¶ 10; Dkt. 92-3 ¶ 9. The following month, MVI deposed Balt's vice-president of engineering, Brian Mitchell, and its vice-president of global quality, Moises Colin, on the new procedure. Belair Decl. ¶ 10. MVI's questions on the topic span almost 100 pages in the deposition transcripts. *Id*. Likewise, when Balt transitioned to its current Rev K manufacturing procedure on July 30, 2021, Balt produced that procedure within two days of implementing it. Belair Decl. ¶ 11; Dkt. 92-3 ¶ 11. A few days later, on August 4, 2021, MVI deposed Balt's senior process engineer, Shima Homayoonieh, on the Rev J and Rev K procedures. Belair Decl. ¶ 11. MVI's questions on these procedures fill 110 pages of that deposition transcript. *Id*. MVI then addressed Revs J and K in its technical and damages reports served on August 27, 2021. *Id*. Indeed, Dr. Kennedy knew when he prepared his opening report that "Balt contends that Balt's Optima Coil System products built in accordance with [Rev J or Rev K] are noninfringing alternatives." Ex. 4 ¶ 164. All of this occurred "prior to the receipt of Kinrich's expert report" on September 21, 2021. Thus, MVI's feigned surprise is no basis for excluding expert testimony on Balt's noninfringing alternative. *See Vehicle IP, LLC v. AT & T Mobility LLC*, 227 F. Supp. 3d 319, 326-26 (D. Del. 2016) (refusing to exclude expert testimony on noninfringing alternatives disclosed for the first time in expert reports); *Tinnus Enterprises, LLC v. Telebrands Corp.*, 2018 WL 6421698, at *3 (E.D. Tex. Oct. 31, 2018) (same).

MVI next cites *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341 (Fed. Cir. 1999), to suggest that a noninfringing alternative is not "available" unless it is on the market when the defendant began selling the accused product. Dkt. 166 at 13. MVI misreads *Grain Processing*. "In *Grain Processing*, [the Federal Circuit] reaffirmed its earlier precedent stating that a technology not on the market at the time of infringement can, in certain

circumstances, constitute an available, noninfringing alternative." *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122–23 (Fed. Cir. 2003); *see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1381 (Fed. Cir. 2017) ("An alternative does not need to be on the market to be available."); *Apple Inc. v. Samsung Elecs. Co.*, 2016 WL 524904, at *8 (N.D. Cal. Feb. 10, 2016).

In *Grain Processing*, the defendant adopted a new manufacturing process (Process IV) after the plaintiff challenged its prior processes (Processes I-III) in a prolonged district court proceeding. *Grain Processing*, 185 F.3d at 1346-47. The change to Process IV took just two weeks. *Id.* at 1346. In a trial on damages for the infringing Processes I-III, the district court found that Process IV was an acceptable noninfringing alternative for the entire accounting period – ***even though it was not on the market during that period*** – and limited the reasonable royalty to the additional cost of manufacturing using Process IV. *Id.* at 1347. The Federal Circuit affirmed, in large part based on the district court's finding that all of the materials needed for Process IV were available throughout the time of infringement, and that the defendant "had all of the necessary equipment, know-how, and experience to implement Process IV whenever it chose to do so during the time of infringement." *Id.* at 1348 (district court findings), 1354 (affirmance). Similarly here, Balt will prove that its new manufacturing process was available throughout the infringement period because Balt was able to rapidly switch to that process using existing materials, equipment, know-how and experience.

MVI complains that Mr. Kinrich cites no evidence that the redesigned Optima product was available at the time of the hypothetical negotiation, that he "fails to demonstrate commercially acceptability," that he never investigated the reliability of Balt's in-house testing of the new design, and that he cites no reliable evidence that the redesigned Optima is non-infringing. Dkt. 166 at 14-15. However, Mr. Kinrich is not being offered to prove that the redesigned Optima is non-infringing or commercially acceptable, or that it was available throughout the

accounting period.  Instead, he relies on Balt and its technical experts to establish these predicate facts underlying his primary reasonable-royalty scenario.  *See, e.g.*, Ex. 1 ¶ 33 ("Balt asserts that Optima coil system products built in accordance with recent revisions to its manufacturing process do not infringe any of the asserted claims."), ¶ 36 ("assuming Revisions J and/or K constitute an acceptable non-infringing alternative, …"), ¶ 38 (relying on Levine for noninfringement), ¶ 39 ("I understand that such an alternative process would have been available to Balt at the time of the hypothetical negotiation, at no additional cost to Balt.").

Balt has been selling its redesigned Optima for over ten months.  Dkt. 92-93 (Mitchell Decl.) ¶ 12.  By the time of trial, Balt fact witnesses such as Ryan Solomon, Balt's vice-president of marketing, will be able to testify to more than a year of commercial sales of the redesigned Optima.  Such sales are significant evidence of commercial acceptability.  *See Fiskars, Inc. v. Hunt Mfg. Co.*, 279 F.3d 1378, 1382 (Fed. Cir. 2002) ("sales data showing market acceptance of a non-infringing alternative may provide significant evidence that the alternative was acceptable to consumers").  Mr. Levine will testify that the redesigned Optima does not infringe.  Ex. 5 (Levine report) ¶¶ 97, 120-34.  And Balt's engineers, Brian Mitchell and Shima Homayoonieh, will describe how Balt switched to its new design using the same materials, equipment, know-how, and experience that it used to produce the accused Optima design.  MVI has deposed all of these witnesses.  Belair Decl. ¶¶ 10-12.  Mr. Kinrich is entitled to rely on these and other disclosed witnesses to establish the foundational facts underlying his reasonable royalty analysis.  *See Apple*, 757 F.3d at 1321 ("patent damages experts often rely on technical expertise outside of their field"); *Radware, Ltd. v. F5 Networks, Inc.*, 2016 WL 590121, at *18 (N.D. Cal. Feb. 13, 2016) (holding that the defendant's employees could provide foundational evidence at trial on commercial acceptability); *Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856 at *2 (N.D. Cal. May 22, 2008) ("The traditional and correct way

- 17 -

to proceed is for a foundational witness to testify first-hand at trial to the foundational fact...and to be cross-examined. Then the expert can offer his or her opinion on the assumption that the foundational fact is accepted by the jury.").

MVI cites no authority suggesting that Balt may not use technical experts and fact witnesses to establish the facts underlying its damages expert's reasonable-royalty analysis. Nor should Mr. Kinrich's opinions be excluded merely because MVI has a different view of the facts. A motion for summary adjudication, not a *Daubert* motion, is the appropriate vehicle by which to establish that one's view of disputed facts is correct as a matter of law.

MVI also argues that Balt's noninfringing alternative should be excluded under Rule 403 to avoid a "mini-trial" that "would unfairly expand the scope of these proceedings." Dkt. 166 at 15-16. However, MVI cites no authority supporting its position. *Id.* This comes as no surprise – the availability of a commercially acceptable noninfringing alternative is regularly litigated in patent cases. *See, e.g., Grain Processing*, 185 F.3d at 1341-56; *Radware,* 2016 WL 590121, at *18. Like the defendants in *Grain Processing* and *Radware*, Balt should be permitted to support its damages position with evidence of its noninfringing alternative. By the time of trial, Balt's redesigned Optima product will have been on the market for over a year, making its commercial acceptability nearly self-evident. It will be highly probative evidence that MVI's patented technology has minimal value. Mr. Kinrich should be permitted to testify about what a reasonable royalty would be if the jury agrees that the redesigned Optima was an available and commercially acceptable noninfringing alternative. *See Radware*, 2016 WL 590121, at *18 *Therasense,* 2008 WL 2323856 at *2.

## C.     The Court Should Not Exclude Testimony On The Costs Balt Incurred In Developing The Redesigned Optima

MVI argues that Mr. Kinrich should not be permitted to discuss Balt's ▮▮▮▮ "estimate" of the cost to implement its new Optima design because there

- 18 -

is allegedly no reliable evidence that the product is noninfringing, and because the "cost estimate was prepared exclusively by Balt employees, without Kinrich's involvement or verification." Dkt. 166 at 16. As an initial matter, the ▮▮▮▮ number is not merely an "estimate" of what it would have cost to implement the new design – it is ***the actual cost that Balt incurred*** in developing its current, redesigned product. Ex. 1 ¶ 35. Moreover, as discussed above, Mr. Kinrich may rely on Balt's technical expert to establish that the redesigned Optima is not infringing, and on Balt's employees to establish the cost of switching to the new design. *See Apple*, 757 F.3d at 1321; *Radware,* 2016 WL 590121, at *18 *Therasense,* 2008 WL 2323856 at *2. And contrary to MVI's claim, these employees are not "unidentified." MVI has already deposed Ms. Homayoonieh, the engineer who oversaw Balt's transition to the Optima redesign, and David Portillo, Balt's corporate designee on financial information that Balt has produced to MVI. Belair Decl. ¶¶ 11-12; Ex. 7 (spreadsheet of costs).

MVI's reliance on *Conagra Foods* is misplaced. There the expert sought to rely on – and quote from – surveys by other experts ***who were not testifying in the case***. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 556 (C.D. Cal. 2014) ("One expert may not give the opinion of another expert who does not testify.") (citation and punctuation omitted). Here, Mr. Levine, Ms. Homayoonieh and Mr. Portillo have already been deposed and will likely testify at trial.

Finally, MVI cites *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008), to argue that reasonable royalty damages are not capped at the cost of implementing a noninfringing alternative. Dkt. 166 at 17. But Mr. Kinrich did not opine that damages are always capped at design-around costs, and "*Mars* is not a blanket prohibition on expert testimony about non-infringing alternatives as a damages measure," *Open Text S.A. v. Box, Inc.*, 2015 WL 393858, at *3 (N.D. Cal. Jan. 29, 2015). *See also Ergotron, Inc. v. Rubbermaid Commercial Prods.*, *LLC*, 2012 WL 3733578, at *12 (D. Minn. Aug. 28, 2012) (refusing to exclude

expert who stated that design-around costs would be a "cap" on the royalty rate) (citing *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571–72 (Fed. Cir. 1996)). Thus, Mr. Kinrich should be permitted to present his primary reasonable royalty scenario, in which the availability of the noninfringing alternative – one Balt is currently selling – would have played a major role in the hypothetical negotiation.

**D.   Mr. Kinrich Did Not Opine On Technical Issues, But Relied On Balt's Technical Experts**

MVI next seeks to bar Mr. Kinrich from offering testimony on technical issues such as infringement and the technological comparability of MVI's prior licenses. Dkt. 166 at 17.  However, Mr. Kinrich expressly stated that his opinions assume these technical facts. *See, e.g.*, Ex. 1 ¶ 36 ("Thus, *assuming* Revisions J and/or K constitute an acceptable non-infringing alternative, the upper bound of the royalty Balt would be willing to pay for the Patents-in-Suit is $60,200.") (emphasis added).  Mr. Kinrich further explained that he is relying on Balt's technical experts, Mr. Levine and Dr. Avery Evans, to establish technical facts. *See, e.g., id*. ¶ 38 (noninfringement of the redesign), ¶ 58 (technological comparability of the Medtronic license), ¶ 64 (Microtransform Agreement); Ex. 8 (deposition) at 40 ("I'm relying on Mr. Levine and his analysis and not on my own"), 42, 67 ("I am accepting that the technical expert's opinion of Rev J and K is correct.").  MVI's motion on this point should be denied.

**E.   MVI's Motion To Limit Kinrich To His Report Is Unnecessary, Premature And Based On A Misreading Of Kinrich's Report**

MVI next asks the Court to bar Mr. Kinrich from offering opinions not set forth in his expert report.  MVI's motion is unnecessary – the Federal Rules already prohibit experts from offering opinions not disclosed in their reports. Fed. R. Civ. P. 26(a)(2)(B).  MVI's motion is also premature.  If and when Mr. Kinrich attempts to offer an undisclosed opinion at trial, MVI can object at that time.

MVI speculates that Mr. Kinrich may offer undisclosed opinions on the technological or economic comparability of the Medtronic license, the license on which Dr. Kennedy bases his reasonable royalty analysis.  Dkt. 166 at 19-21.  MVI's professed concern is unwarranted.  Mr. Kinrich's view of the ███ patent – the patent licensed in the Medtronic agreement – is entirely based on the expert opinions offered by Mr. Levine in his expert report.  *See, e.g.*, Ex. 1 ¶¶ 58-62 ("I understand from Mr. Levine that the ███ patent is not technologically comparable to the Patents-in-Suit.").  MVI suggests that Mr. Levine's opinions – such as his view that ███ patent is a foundational patent in the ███ field – are incorrect.  Balt disagrees, but that issue must be addressed in connection with MVI's motion to exclude Mr. Levine's testimony.  If Mr. Levine is permitted to offer the opinions on technological comparability in his report, and if he does so at trial, then Mr. Kinrich should be able to rely on those opinions in presenting his own analysis to the jury.  *See Apple*, 757 F.3d at 1321.

MVI claims Mr. Kinrich "undertakes no economic analysis" of the economic comparability of the Medtronic license, such as an analysis of any "differences in the 'economic circumstances' of the contracting parties."  Dkt. 166 at 20-21 (emphasis removed).  However, Mr. Kinrich's opinion that the Medtronic license is not economically comparable is based on Mr. Levine's opinion that the ███ patent is far more important in the ███ field than the asserted MVI patents are in the endovascular implant field.  Ex. 1 ¶¶ 58-62 (relying on Mr. Levine's opinion that the ███ patents are widely used and foundational, whereas the asserted MVI patents describe incremental improvements, are rarely used, and have many commercially acceptable alternatives).  Mr. Kinrich will not testify about the differences in the economic circumstances of the contracting parties or any other matter not addressed in his expert report.

**F.   MVI's Argument That Kinrich Should Be Barred From Testifying On Economic Comparability Is Redundant Of Its Earlier Arguments**

MVI next argues that Mr. Kinrich should not be permitted to address the economic comparability of the Microtransform Agreement or the Medtronic license.  This section of MVI's brief is completely redundant of earlier sections.  As discussed above, the degree of comparability of the Microtransform Agreement and any weaknesses in Mr. Kinrich's analysis should be addressed through cross examination, not exclusion.  *ActiveVideo*, 694 F.3d at 1333.  *See supra*, at 7-12.  Likewise, Mr. Kinrich's opinion on the economic comparability of the Medtronic license is simply that, based on Mr. Levine's opinion that the ▇▇▇ patent is far more important than the asserted MVI patents, the Medtronic license involved far more valuable technology.  *See supra*, at 21-21.  For the reasons discussed above, the Court should not exclude Mr. Kinrich's opinions on comparability.

**G.   Kinrich Should Not Be Precluded From Critiquing Kennedy's Distortion Of The Royalty Base And Unsupported Assumptions**

MVI's last substantive argument[5] seeks the exclusion of Mr. Kinrich's critique of the manner in which Dr. Kennedy determined Balt's royalty base, *i.e.*, the average sale price of the accused Optima products.[6]

Balt USA sells the Optima directly to purchasers in the United States and abroad, but also to Balt's French parent company, Balt Extrusion ("Balt France").

---

[5]  MVI's brief does contain a short final section asking the Court to preclude Mr. Kinrich from "misrepresenting his education and experience to the jury."  Dkt. 166 at 25.  Mr. Kinrich will not do so and, if he did, MVI could cross-examine him on the subject.  MVI's motion is premature and should be denied.

[6]  A reasonably royalty may be calculated by multiplying the reasonable royalty rate times the total dollar sales of the accused product.  Alternatively, the rate may be multiplied by the average sale price of the accused product to produce a per-unit royalty.  The per-unit royalty is then multiplied by the number of accused products to yield a total royalty.  Dr. Kennedy opted for the second approach.

Balt France re-sells the Optima products it purchases from Balt USA to end users in Europe and nearby regions. Mr. Kinrich opined that the average sale price for the Optima should be the average price received by Balt USA, the defendant in this case. Ex. 1 ¶¶ 72-74. For the products that Balt USA sells to Balt France, Balt USA charges Balt France a price called a "transfer price." *Id*. Mr. Kinrich, who is very familiar with international transfer pricing rules, explained that the IRS and foreign tax authorities require that international transfer prices be set at the price the seller would receive in an arms-length transaction between unrelated parties. Ex. 1 ¶¶ 76-77; Ex. 8 at 287-291. This is important for tax reasons. For example, in this case, if Balt's transfer price were set too high, Balt USA's profits would go up and Balt's France's would go down, with the result that the IRS would collect more tax and the French tax authority less. Conversely, if the transfer price were set too low, the IRS would collect less tax than it should, and the French tax authority would collect more. Mr. Kinrich therefore opined, based on his experience with transfer pricing, that Balt's transfer price represents an arms-length price and should be used in calculating the amount of revenue Balt USA has received for its Optima products. Ex. 1 ¶ 76-78.

Dr. Kennedy did not use the transfer price – the revenue that Balt USA actually received – in his calculation of the royalty base. Instead he attempted to use the entire sale price that Balt France received from end users in Europe, even though Balt USA received only part of that amount from Balt France. Ex. 4 ¶ 102 (referring to Balt France's sale price as "third-party revenue" from intercompany sales). But because Dr. Kennedy did not have the actual sale price figures, he guessed at the end-user sale price by assuming that the profit margin on Optima products was the same as the overall profit margin for all Balt entities ("the consolidated gross margin"). *Id*. (describing his "estimate" of "third-party revenue"); Ex. 1 ¶¶ 73-74, 80(c)-(d). Dr. Kennedy also opined that the transfer price is unreliable because it is determined by Balt France. Ex. 4 ¶¶ 101-02.

In critiquing Dr. Kennedy's calculation of the royalty base, Mr. Kinrich makes four points. First, he opines that Dr. Kennedy erred in seeking to attribute to Balt USA all of Balt France's revenue from selling Optima products to end users. Ex. 1 ¶ 80(c)-(d). Balt France maintains a sales force, markets the Optima in Europe, and provides customer service to end users there – it must therefore pay the costs associated with fulfilling those functions and also make a profit. *Id.*

Second, Mr. Kinrich opined that Dr. Kennedy erred in calculating the average price that Balt France received from selling Optima products to end users. *Id.* ¶ 80(a)-(b). He had no basis for assuming that the profit margin on sales of Optima products in Europe is the same as the consolidated profit margin for sales of *all* Balt products (not just the Optima) across all countries worldwide. *Id.*

Third, Mr. Kinrich disagreed with Dr. Kennedy's position that the transfer prices "are not indicative of the value and profitability of the Accused Products." Ex. 4 ¶ 101. As discussed above, Mr. Kinrich explained that IRS and foreign regulations require that transfer prices represent arm's length prices. Ex. 1 ¶ 77.

Fourth, relying on Mr. Portillo, Mr. Kinrich noted that Balt's transfer prices have not been audited or investigated by the IRS. *Id.* In Mr. Kinrich's opinion, this is further confirmation that Balt's transfer prices reflect the value of the Optima to an arm's length purchaser.

MVI argues that Mr. Kinrich should not be permitted to make the third and fourth points above.[7] Dkt. 166 at 24. MVI argues that Mr. Kinrich does not know exactly how Balt France calculates the transfer price, and that his testimony about the absence of an IRS inquiry is double hearsay. *Id.* However, Mr. Kinrich's view that the transfer price is an arm's length price (Point 3) is based on his familiarity with the relevant government regulations requiring arm's length pricing, not his knowledge of how Balt determined the arm's length prices. As

---

[7] MVI's motion does not argue that Mr. Kinrich's first two critiques of Dr. Kennedy's analysis should be excluded.

for the absence of an IRS inquiry (Point 4), experts like Mr. Kinrich can rely on hearsay in forming their opinions. *EcoServices, LLC v. Certified Aviation Servs., LLC*, 312 F. Supp. 3d 830, 839 (C.D. Cal. 2018). Moreover, if Balt's witnesses lay a foundation at trial by testifying to the absence of any IRS investigation, Mr. Kinrich should be permitted to refer to that fact.

Finally, MVI asks the Court to exclude Exhibit 5 to Mr. Kinrich's report, Dkt. 166 at 24-25, a document that lists Balt France's actual sales prices for the Optima, Ex. 1 at Exhibit 5. MVI claims it had no opportunity to conduct discovery on this financial document because it was produced for the first time with Mr. Kinrich's report. But Balt timely disclosed its transfer prices during discovery. During fact discovery, Balt had no idea that MVI's expert would disregard Balt's transfer prices – the amounts actually received by the only defendant in this case – and improperly seek royalties on revenues earned by a related entity. In any event, if MVI really believed that Balt France's sale prices were important for calculating damages in this case, it should have pressed for that information in discovery, moving to compel if necessary. It failed to do so. Belair Decl. ¶ 13. Nor did MVI request to depose someone at Balt France about the sales data after MVI received Mr. Kinrich's report. *Id.* After declining to pursue discovery on Balt France's sale prices, MVI cannot now prevent Balt from cross-examining an MVI expert ***who guessed at Balt France's sale prices*** using a document showing the true prices. That would be particularly unfair given that Mr. Kennedy's guess of ▮ per unit is ***far higher*** than the real average sale price of ▮ a unit. Ex. 1 at ¶ 80(d) and Ex. 5. MVI should not be permitted seek vastly inflated damages based on figures that are indisputably false. MVI's motion to exclude the true sales figures should be denied.

## IV.   CONCLUSION

For the foregoing reasons, MVI's motion to exclude the expert testimony of Mr. Kinrich should be denied in its entirety.

- 25 -

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  June 17, 2022          By: */s/ Sean M. Murray*

       Sheila N. Swaroop
       Sean M. Murray
       William O. Adams
       Nicholas A. Belair
       Alexander Zeng

Attorneys for Defendant/Counterclaimant,
Balt USA, LLC

55292068

# EXHIBIT 2

REDACTED
IN ITS
ENTIRETY

# EXHIBIT 3

Case 1:21-cv-00525-MJN Document 269-5-1 Filed 06/07/24 Page 36 of 102 PageID #:
11427
Case 3:17-cv-1375-DMS-MDD Document 265-1 Filed 01/17/18 PageID.21302 Page 2 of 34

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

Juanita R. Brooks, SBN 75934, brooks@fr.com
Seth M. Sproul, SBN 217711, sproul@fr.com
Frank J. Albert, SBN 247741, albert@fr.com
Joanna M. Fuller, SBN 266406, jfuller@fr.com
Robert M. Yeh, SBN 286018, ryeh@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Phone:  858-678-5070 / Fax: 858-678-5099

Ruffin B. Cordell, DC Bar No. 445801, appearing *pro hac vice*, cordell@fr.com
Lauren A. Degnan, DC Bar No. 452421, appearing *pro hac vice*, degnan@fr.com
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W. Suite 1000
Washington, D.C. 20024
Phone: 202-783-5070 / Fax: 202-783-2331

Mark D. Selwyn, SBN 244180, mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Phone: 650-858-6000 / Fax: 650-858-6100

[Additional counsel listed in signature block on last page.]

Attorneys for *Defendant/Counterclaim-Plaintiff APPLE INC.*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| QUALCOMM INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INCORPORATED,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 3:17-CV-1375-DMS-MDD<br><br>**APPLE INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS DAUBERT MOTION TO EXCLUDE TESTIMONY OF DRS. PRINCE, KENNEDY, BROGIOLI, AND KELLEY**<br><br>**FILED UNDER SEAL**<br><br>Case No. 3:17-CV-1375-DMS-MDD |

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

## TABLE OF CONTENTS

I.  BACKGROUND ............................................................................................ 1

    A.  Qualcomm's Damages Expert Reports ..................................................... 2

        1.  The '490, '558, and '936 Patents ................................................ 2

        2.  The '949 Patent ........................................................................... 4

        3.  ███████████████████ ................................................. 5

    B.  Dr. Brogioli's Opinions ........................................................................... 6

        1.  ███████████████████████████ ................... 6

        2.  ████████████████████████████████████ 6

        3.  ███████████████████████████ ................... 7

    C.  Dr. Kelley's Opinions ............................................................................. 8

II.  LEGAL STANDARDS ............................................................................... 9

III.  ARGUMENT ............................................................................................... 9

    A.  The Court Should Exclude Dr. Prince's Survey Results ......................... 9

        1.  The Survey Results Are Not Tied to the Claims .......................... 9

        2.  The Survey Results Are Not Apportioned ................................. 12

    B.  The Court Should Exclude Dr. Kennedy's Opinions ............................ 14

        1.  ████████████████████████
           ██████████████ .......................................... 15

        2.  The Court Should Exclude Dr. Kennedy's
           Opinions that Rely on the Prince Survey Results ....................... 17

        3.  ███████████████████████████
           ██████████ .......................................... 17

    C.  The Court Should Exclude Dr. Brogioli's Opinions ............................. 18

        1.  Dr. Brogioli's Opinions Are Irrelevant and Not
           Helpful ....................................................................................... 19

        2.  Dr. Brogioli's Opinions Are Not Proper Expert
           Testimony .................................................................................. 20

i    Case No. 3:17-CV-1375-DMS-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

D. The Court Should Exclude Dr. Kelley's "Power Savings" Opinions ................................................................................... 22

IV. CONCLUSION ....................................................................................... 23

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Biscotti Inc. v. Microsoft Corp.*,
   No. 2:13-CV-01015-JRG-RSP, 2017 WL 2536962 (E.D. Tex. May 18,
   2017) ................................................................................................................ 16

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys.*,
   809 F.3d 1295 (Fed. Cir. 2015) ........................................................................ 14

*Competitive Edge, Inc. v. Staples, Inc.*,
   763 F. Supp. 2d 997 (N.D. Ill. 2010) ................................................................ 17

*Daubert v. Merrell Dow Pharm. Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ............................................................................ 20

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) ................................................................... 9, 10, 19, 20

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
   879 F.3d 1299 (Fed. Cir. 2018) ........................................................................ 12

*Fractus, S.A. v. Samsung*,
   No. 6:09-CV-203-LED-JDL, 2011 WL 7563820 ................................. 9, 10, 11

*Good Tech. Corp. v. Mobileiron, Inc.*,
   No. 5:12-CV-05826-PSG, 2015 WL 4090431 (N.D. Cal. July 5, 2015) .......... 16

*Limelight Networks, Inc. v. XO Commc'ns, LLC*,
   No. 3:15-CV-720-JAG, 2018 WL 678245 (E.D. Va. Feb. 2, 2018) ............. 5, 16

*NetAirus Techs., LLC v. Apple, Inc.*,
   No. LACV1003257, 2013 WL 12322092 (C.D. Cal. Oct. 23, 2013) ............ 10, 11

*In re Novatel Wireless Sec. Litig.*,
   No. 08-cv-1689-AJB (RBB), 2011 WL 5827198 (S.D. Cal. Nov. 17,
   2011) ................................................................................................................ 20

*Numatics, Inc. v. Balluff, Inc.*,
   66 F. Supp. 3d 934 (E.D. Mich. 2014) .............................................................. 16

*Oracle Am., v. Google Inc.*,
   No. C 10-3561, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012) .......................... 13

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

*Politte v. United States*,
No. 07CV1950 AJB WVG, 2011 WL 2149917 (S.D. Cal. June 1, 2011) ............ 19, 20

*Riles v. Shell Expl. & Prod. Co.*,
298 F.3d 1302 (Fed. Cir. 2002) ...................................................................... 12

*Shalaby v. Irwin Industrial Toll Co.*,
No. 07-cv-2107-MMA (BLM), 2009 WL 7452756 (S.D. Cal. July 28,
2009) ........................................................................................................ 19, 20

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
No. 15-cv-2370 ................................................................................................ 13

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ...................................................................... 15

*Virnetx, Inc. v. Cisco Sys., Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ...................................................................... 15

*Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*,
No. 10-cv-10578, 2016 WL 5956325 (E.D. Mich. Oct. 14, 2016) ............................ 13

**Other Authorities**

Fed. R. Evid. 702 ...................................................................................... 9, 19, 20

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

Apple respectfully requests that the Court exclude the opinions of Qualcomm's experts Drs. Jeffrey Prince, Patrick Kennedy, Michael Brogioli, and Arthur Kelley, which are unmoored from the facts, circumstances, and asserted claims of this litigation. Dr. Kennedy's opinions rely on a flawed survey, an unrealistic analysis of how Apple and Qualcomm would have split the incremental profits allegedly attributable to the asserted patents, and an unreliable estimate of the cost of adding a flash memory component to the accused products. Dr. Prince's opinions relate to that flawed survey, which neither is tied to the patented technology nor does it apportion between the patented and unpatented features. Dr. Brogioli's opinions merely summarize documents on topics regarding which he has no specialized knowledge and are not tied to the claims and defenses in this case. And Dr. Kelley's opinions lack a nexus to the '558 patent's claimed invention, and instead compare power savings from two prior art techniques. These opinions are unreliable, irrelevant, and should be excluded.

# I. BACKGROUND

In this litigation, Qualcomm now accuses Apple of infringing four patents:

**U.S. Patent No. 8,698,558**: The '558 patent relates to an alleged improvement to prior art envelope tracking ("ET") technology. The prior art also taught an "average power tracking" ("APT") approach, which is different from the allegedly inventive '558 approach to envelope tracking.[1] ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

**U.S. Patent No. 8,633,936**: The '936 patent generally relates to "mixed-precision" processor architectures, and specifically to the use of a separate instruction to

---

[1] **APT** generates a power amplifier supply voltage based on a signal indicating the largest amplitude of the envelope of the power amplifier output signal in different time intervals. ('558 patent at 4:10-16.) **ET** generates a power amplifier supply voltage based on an envelope signal indicative of the envelope of the power amplifier output signal. (*Id.* at 4:21:26.)

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

convert the precision of graphics data in such a processor. ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

**U.S. Patent No. 9,535,490**: The '490 patent relates to the timing of uplink and downlink data transmissions over the bus connecting the modem processor and application processor. ████████████████████████████████████████

████████████████████████████████████████████████

**U.S. Patent No. 8,838,949**: The '949 patent relates to a particular way for performing "flashless boot," which involves "booting up a secondary processor that does not have its own non-volatile memory to store the system image." (Dkt. 1 [Complaint] at 13.) ████████████████████████████████████████

████████████████████████████████████

## A.    Qualcomm's Damages Expert Reports

Qualcomm's damages expert, Dr. Kennedy, has opined on the reasonable royalty that he believes Qualcomm should receive for the four asserted patents.

### 1.    The '490, '558, and '936 Patents

Dr. Kennedy begins with the '490, '558, and '936 patents (collectively, "Component Power Patents"), which Qualcomm contends result in power savings at the component level. Dr. Kennedy sought to "████████████████████████

████████████████████████████████████████████████

████████████████████    ████████████████████████

_____

[2] ████████████████████████████████████████████████

████████████████████████████████████████████

2

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1 ███████████████████████████████████████████

2 ███████████████████████████████████████████

3 ███████████████████████████████████████████

4 ████████████████████████    ████████████████

5 Dr. Kennedy relied completely on the results of Dr. Prince's conjoint survey to

6 determine these "price premiums."

7        Dr. Prince's survey was ostensibly intended to measure ████████████

8 █████████  ████████████████  ████████████████

9 ███████████████████████████████████████████

10 ███████████████  ███████████████████████████

11 ███████████████████████████████████████████

12 ███████████████████████████████████████████

13 ████████████  ██████  ███████████████████████

14 ███████████████████████████████████████████

15 ███████████████████████████████████████████

16 ███████████████████████████████████████████

17 ███████████████████████████████████████████

18 ███████████████████████████████████████████

19 ██████████████████████████████████████

20   ███████████████████████████████████████████

21 ███████████████████████████████████████████

22 ███████████████████████████████████████████

23 ███████████████████████████████████████████

24 ███████████████████████████████████████████

25 ███████████████████████████████████████████

26 ███████████████████████████████████████████

27 ███████████████████████████████████████████

28

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1 ███████████████████████████████████████████████

2 ████

3 ████████████████████████████████████████████

4 ██████████████████████████████████████████████

5 ██████████████████████████████████████████████

6 ████  ████████████████████████████████████████

7 ███████████████████████████████████████

8

9

10

11

12 ██████████████

13         2.      The '949 Patent

14     Dr. Kennedy took a different approach for the '949 patent.   ████████

15 ███████████████████████████████████████████████

16 ███████████████████████████████████████████████

17 ███████████████████████████████████████████████

18 █████████████████████████  ██████████████████████

19 ███████████████████████████████████████████████

20 ████████████████████████████  ███████████████████

21 ████████████████████████████████████

22    ██████████████████████████████████████████████

23 ███████████████████████████████████████████████

24 ███████████████████████████████████████████████

25 ███████████████████████████████████████████████

26 ███████████████████████████████████████████████

27

28

4

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY



**3.     Dr. Kennedy's Fifty-Fifty Profit Split**

He did so by applying the Rubinstein model, an economics model that "essentially stands for the idea that the more patient party in a negotiation will fare better than the less patient party." *Limelight Networks, Inc. v. XO Commc'ns, LLC*, No. 3:15-CV-720-JAG, 2018 WL 678245, at *3 (E.D. Va. Feb. 2, 2018).

5

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1    **B.    Dr. Brogioli's Opinions**

2        Qualcomm submitted Dr. Brogioli's "rebuttal" expert report on October 9, 2018.

3    The report purports to show ████████████████████████

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12       **1.**   ████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████

15   ██████████ ████  ████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████

21   ████████████████████████████████ ██████████████████

22   ██████████████

23       **2.**   ██████████████████████████

24   ██ ██ ██ ██ ██ ██ ██  ██  ████ ██ ██████ ██ ██ ██

25   ████████████████████████████████████ ████████████████

26   ████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28   ████████████████████████████████████████████████████

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

**3.**

---

3   A log file is a file that details the activities that occur on a system as it runs software and can be used for debugging.

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1

2

3

**C.    Dr. Kelley's Opinions**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

## II. LEGAL STANDARDS

"[T]rial judges [have] the responsibility of acting as gatekeepers to exclude unreliable expert testimony." Fed. R. Evid. 702, Comm. Notes on Rules, 2000 Amend.; *see also Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). As the party tendering the expert, Qualcomm bears the burden of persuasion on the reliability of its experts' opinions. *Daubert*, 509 U.S. at 592 n.10.

## III. ARGUMENT

### A. The Court Should Exclude Dr. Prince's Survey Results

Dr. Prince's survey is not tied to the facts of the case, and so should be excluded. *First*, ████████████████████████████████████████████████ ████████████████████████████████████████ ██████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████████ █████ ██████████████████████████████████████████████████ ██████████████████████████████████ *Second*, █████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████████████████████

Because either of these flaws alone is sufficient to render the survey results unreliable, the Court should step in as gatekeeper and strike the results.

#### 1. The Survey Results Are Not Tied to the Claims

The Prince survey is unreliable because the survey questions are not tied to the asserted claims. To quantify how much respondents value a patented feature, a survey should focus on that specific feature, and not other, much broader features. Otherwise,

9

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1  the survey will sweep in patented and unpatented features, covering far more than the

2  claimed invention at issue.  For example, in *Fractus, S.A. v. Samsung*, the plaintiff's survey

3  "attempt[ed] to quantify the estimated value of consumer preference for internal

4  antennas in cell phones."  No. 6:09-CV-203-LED-JDL, 2011 WL 7563820, at *1 (E.D.

5  Tex. Apr. 29, 2011).  However, because the claims did not cover all internal cell phone

6  antennas, but merely a particular internal antenna design, the court held that the

7  questions were "not tied to the alleged advantageous technical characteristics of the

8  patents-in-suit," and must be excluded so as not to "confuse[] the issues" for the jury.

9  *Id.*  The court reasoned "the surveys do not measure how consumers value the purported

10 advantages" of the patented inventions, but "merely measure[d] the perceived consumer

11 value of cell phones with any internal antennas."  *Id.*; *see also NetAirus Techs., LLC v. Apple,*

12 *Inc.*, No. LACV1003257, 2013 WL 12322092, at *3-4 (C.D. Cal. Oct. 23, 2013) (excluding

13 survey questions about the value of an iPhone with Wi-Fi capability because these

14 questions were "significantly broader than the claimed invention," involving

15 "functionality far beyond the asserted claims," which related to email over Wi-Fi).

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. 3:17-CV-01375-JAH-MDD

Case 1:21-cv-00525-MN-MDD   Document 260-15-1   Filed 06/07/24   Page 51 of 102 PageID #:
11442
Case 3:17-cv-01975-MS-MDD   Document 465-1   Filed 01/27/18   Page 51 of 102   Page 16 of
11442

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1

2

3

4

5

6

7

8

9

10

11

12

13                                                     As in *Fractus*, "the surveys do

14   not measure how consumers value the purported advantages" of the patented inventions.

15   2011 WL 7563820, at *1; *see also NetAirus*, 2013 WL 12322092, at *3-4.

16

17

18

19

20

21

22

23

24

25

[4]

26

27

28

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

5    Because the survey attempts to value features far broader than the asserted

6    claims, the Court should exclude the results.

### 2.    The Survey Results Are Not Apportioned

8    Dr. Prince's survey results are also unreliable because they do not provide a basis

9    for valuing improved battery life as compared to other unpatented features.

17    *Riles v. Shell Expl. & Prod.*

18    *Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299,

19    1311 (Fed. Cir. 2018) ("Further apportionment was required to reflect the value of the

20    patented technology compared to the value of the unpatented elements.").

12

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1 ██████████████████████████████████████████

2 ████████████████████████████    ████████████

3 ██████████████████████████████████████████

4 ██████████████████████████████████████████

5 ████████████████████

6     Survey results that do not properly account for unpatented features should be

7 excluded.  In one case, the damages expert based his royalty opinions on a "willingness-

8 to-pay" survey that purportedly determined "the value conferred on a 4G handset by

9 improved battery life" and "faster data speeds"—benefits the plaintiff's technical expert

10 had attributed to the LTE standard.  *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget*

11 *LM Ericsson*, No. 15-cv-2370 JVS(DFMx), 2018 WL 4488286, at *28 (C.D. Cal. Sept. 14,

12 2018).   As  the  court  noted,  "[r]esearch  shows  that  singling  out  features  without

13 simultaneously considering other features tends to greatly overstate the importance of

14 the focal feature, as compared to its impact in actual purchase decisions."  *Id.* at *29.

15 Thus, the court found that "any attempt to gauge feature value by asking questions about

16 willingness to pay for specific features is unreliable."  *Id.*; *see also Visteon Glob. Techs., Inc.*

17 *v. Garmin Int'l, Inc.*, No. 10-cv-10578, 2016 WL 5956325, at *5, *15-16 (E.D. Mich. Oct.

18 14, 2016) (striking survey because "[w]hatever the economic or mathematical soundness

19 of [the patentee's damages expert's] calculation, it fails to demonstrate apportionment as

20 required under Federal Circuit law"); *Oracle Am., v. Google Inc.*, No. C 10-3561, 2012 WL

21 850705, at *10 (N.D. Cal. Mar. 13, 2012) (striking survey that excluded "important

22 product features, such as battery life, WiFi, weight, and cellular network, all of which

23 were not covered by the patented functionalities," instead testing "an arguably

24 unimportant feature, voice dialing").

25 ██████████████████████████████████████

26 ██████████████████████████████████████████

27 ██████████████████████████████████████████

28 ██████████████████████████████████████████

Case No. 3:17-CV-01375-JAH-MDD

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys.*, 809 F.3d 1295, 1302 (Fed. Cir. 2015) ("[Q]ualitative testimony that an invention is valuable—without being anchored to a quantitative market valuation—are insufficiently reliable."). Dr. Prince's survey results are not a proxy for apportionment. The Court should strike these results.

**B.      The Court Should Exclude Dr. Kennedy's Opinions**

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

**1.** ███████████████████████████████████
███████████████████████████████

Dr. Kennedy's purported hypothetical negotiation relies on an improper ██████

████████████████████████████████████████████████

████████████████████████████████████████ The

Federal Circuit has rejected similar models as "an inappropriate 'rule of thumb,'" admissible only if the expert can "establish[] that the premises of the theorem actually apply to the facts of the case at hand." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332-33 (Fed. Cir. 2014) (vacating a damages award because the patentee's expert relied on the Nash Bargaining Solution to begin the hypothetical negotiations with a 50-50 split of incremental profit). Similarly, the Federal Circuit has rejected the 25% rule, under which the hypothetical negotiations start with 25% of the profits associated with an allegedly infringing product, because the rule "fails to tie a reasonable royalty base to the facts of the case at issue" and does not differentiate "between different industries, technologies, or parties." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).

████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████     ████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████     ███████████████     █████████████

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

5   Courts have rejected the application of economic theorems that are divorced from

6 the facts of a case. In *Limelight*, the court excluded expert testimony that applied the

7 Rubinstein model—████████████████████████████—based on the

8 companies' relative WACCs—a████████████████████ *See*

9 2018 WL 678245, at *3. As the court explained, "using WACC as a proxy for patience

10 in the Rubinstein model does not consider the actual stakes in the hypothetical

11 negotiation or even the specific patents negotiated." *Id.* Further:

12     [The expert's[7]] model would split the gains in the same way for a

13     fundamental patent at the core of a company's technology and for a piece

14     of technology that the company might consider not at all valuable. Indeed,

15     the model would split any negotiation between the parties in the same way,

16     no matter the stakes.

17 *Id.* In short, the court held that using WACCs in this way has "no relationship to the

18 patents in this case and cannot reliably show how the parties would negotiate over these

19 patents." *Id.*; *see also Biscotti Inc. v. Microsoft Corp.*, No. 2:13-CV-01015-JRG-RSP, 2017 WL

20 2536962, at *5 (E.D. Tex. May 18, 2017) (excluding 40/60 split as "entirely conclusory,"

21 despite expert's argument that split reflected weighted average cost of capital); *Good Tech.*

22 *Corp. v. Mobileiron, Inc.*, No. 5:12-CV-05826-PSG, 2015 WL 4090431, at *7 (N.D. Cal. July

23 5, 2015) (excluding opinion where expert "fail[ed] to tie the 50/50 split to the specifics

24 of this case or to explain why such a split would be reasonable—other than to invoke a

25 boilerplate assertion about the relative bargaining powers of the parties"); *Numatics, Inc.*

26 *v. Balluff, Inc.*, 66 F. Supp. 3d 934, 960 (E.D. Mich. 2014) (rejecting 50/50 split not tied

---

[7] Dr. Prowse, the expert in *Limelight*, is Apple's damages expert in this case.

16

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1    to facts of the case). ████████████████████████████████████

2    ████████████████████████████████████████████████████

3            **2.      The Court Should Exclude Dr. Kennedy's Opinions that Rely**
4                      **on the Prince Survey Results**

5        Because the Prince survey results are unreliable and should be excluded, *see supra*

6    Section III.A, the Court should also exclude Dr. Kennedy's opinions relating to the

7    Component Power Patents, which rely on that survey.  *Competitive Edge, Inc. v. Staples, Inc.*,

8    763 F. Supp. 2d 997, 1007 (N.D. Ill. 2010).

9            **3.**      ████████████████████████████
                          ████████████████████████████
10   ██████████████████████████████████████████████████
11   ████████████████████████████████████████████████████
12   ███████  ██   ████████████████████████████████████████
13   ████████████████████████████████████████████████████
14   ████████████████████████████████████████████████████
15   ██████████████████████████████████
16      ██████████████████████████████████████████████████
17   ████████████████████████████████████████████████████
18   ████████████████████████████████████████████████████
19   ████████████████████████████████████████████████████
20   ████████████████████████████████████████████████████
21   ████████████████████████████████████████████████████
22   ████████████████████████████████████████████████████
23   ████████████████████████████████████████████████████
24   ████████████████████████████████████████████████████
25   ████████████████████████████████████████████████████
26   ████████████████████████████████████████████████████
27   ████████████████████████████████████████████████████
28

17

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

**C.    The Court Should Exclude Dr. Brogioli's Opinions[8]**

Dr. Brogioli's opinions should be excluded because they are (i) irrelevant, and (ii) improper expert opinions.  This Court has correctly recognized that the relevance of discovery underlying Dr. Brogioli's opinions is "tenuous, at best" and that the subject matter of his opinions is a "side show." (Dkt. 319 at 5; Dkt. 426 (overruling Qualcomm's objections to the same).)   This same rationale strongly supports Apple's motion. Moreover, in the related 1065 Investigation,[9] the Administrative Law Judge ("ALJ") excluded Dr. Brogioli's similar opinions, finding *inter alia* that "[h]is testimony is not helpful" because it "comprises summaries of documents produc[ed] in this investigation, followed by his opinions as to what the documents mean" and "[t]here is no indication

---

[8] Apple has separately moved to strike Dr. Brogioli's rebuttal expert report on procedural grounds.  (Dkt. 409.)

[9] U.S. International Trade Commission ("ITC") Investigation No. 337-TA-1065.

Case No. 3:17-CV-01375-JAH-MDD

1  that Dr. Brogioli has specialized knowledge concerning the topic of his testimony." (Ex.

2  Q [1065 Order No. 42] at 4.) Dr. Brogioli's opinions here fail for the same reasons.[10]

3  **1.  Dr. Brogioli's Opinions Are Irrelevant and Not Helpful**

4  "Rule 702 [] requires that the evidence or testimony assist the trier of fact to

5  understand the evidence or to determine a fact in issue. This condition goes primarily to

6  relevance. *Expert testimony which does not relate to any issue in the case is not*

7  *relevant and, ergo, non-helpful.*" *Daubert*, 509 U.S. at 591 (citations omitted); *see also*

8  *Shalaby v. Irwin Industrial Toll Co.*, No. 07-cv-2107-MMA (BLM), 2009 WL 7452756, at

9  *10 (S.D. Cal. July 28, 2009) ("Relevancy requires opinions that would assist the trier of

10  fact in reaching a conclusion necessary to the case."). Expert opinions that are "irrelevant

11  to the causes of action pled" should be excluded. *See Politte v. United States*, No. 07CV1950

12  AJB WVG, 2011 WL 2149917, at *1 (S.D. Cal. June 1, 2011).

13  Dr. Brogioli's opinions should be excluded because they are not relevant to any

14  issue in this case. Dr. Brogioli purports to tie his opinions to two issues: ███████

15  ████████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████████████

17  ██████████████████████         █████████████████████████████

18  ████████████████████     ████████████████████████████████████

19  ████████████████████████████████████████████

20  ███████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████

24  ████████████████████████████████████████████   ██████████

25  ██████████  Dr. Brogioli's failure to tie his opinions to the claims or defenses at issue

---

26  [10] In a subsequent ITC matter concerning unrelated patents (Investigation No. 337-TA-

27  1093), Dr. Brogioli was permitted to testify. Unlike in this case, however, Dr. Brogioli claimed that his opinions were relevant to statutory public interest factors unique to the

28  ITC.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1    in this case is fatal. *Shalaby*, 2009 WL 7452756, at *11 (excluding expert opinion as not

2    "sufficiently linked to the facts of [the] case"); *Politte*, 2011 WL 2149917, at *1 (excluding

3    expert opinion because not tied to actions pled).

4        Assertions made by Apple's attorneys in the CMS nearly eleven months ago also

5    do not open the door to a lengthy technical expert report that is irrelevant to the parties'

6    claims and defenses. As the Ninth Circuit has cautioned, "scientific expert testimony

7    carries special dangers to the fact-finding process because it can be both powerful and

8    quite misleading because of the difficulty in evaluating it" and should be excluded unless

9    the judge is "convinced that it speaks clearly and directly to an issue in dispute in the

10    case, and that it will not mislead the jury." *Daubert v. Merrell Dow Pharm. Inc.*, 43 F.3d

11    1311, 1321 n. 17 (9th Cir. 1995). Here, where Dr. Brogioli's opinions do not speak clearly

12    to the issues in the case and instead focus on complicated technical arguments with

13    inflammatory innuendo (*i.e.*, ███████████████████████████████

14    ████, they are likely to mislead the jury and should be excluded.

15        **2.**     **Dr. Brogioli's Opinions Are Not Proper Expert Testimony**

16        Dr. Brogioli's opinions should be stricken for the second, independent reason that

17    they are not proper expert testimony. Fed. R. Evid. 702(a); *Daubert*, 509 U.S. at 597. As

18    the ALJ noted in the 1065 Investigation, simply summarizing documents and providing

19    "opinions as to what those documents mean," as Dr. Brogioli has done, is "not helpful."

20    (Ex. Q [1065 Order No. 42] at 4-5.) Courts in this District have similarly excluded expert

21    testimony where "no specialized or technical knowhow is required to read and draw

22    conclusions from the internal documents and testimony cited." *In re Novatel Wireless Sec.*

23    *Litig.*, No. 08-cv-1689-AJB (RBB), 2011 WL 5827198, at *4 (S.D. Cal. Nov. 17, 2011).

24    ████████████████████████████████████████████

25    ██████████████████████████████████████████████

26    ████████████████████████████████████████████

27    ████████████████████████ ████████████████████

28

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24 Dr. Brogioli has

25 done nothing more than recite the contents of these documents and form baseless

26 opinions about them.

27

28

Case No. 3:17-CV-01375-JAH-MDD

Case 1:21-cv-00525-MN Document 260-15 Filed 06/07/24 Page 62 of 102 PageID #:
11453
Case 3:17-cv-01375-JAH-MDD Document 455-1 Filed 10/12/18 PageID.21328 Page 27 of
53

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

### D. The Court Should Exclude Dr. Kelley's "Power Savings" Opinions

Dr. Kelley's methodology for attributing power savings to the claimed '558 invention is unreliable for two reasons.

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

16    Because Dr. Kelley's attribution of power savings to the '558 patent rests on two
17 fundamentally flawed numbers, it should be excluded.

18 **IV.    CONCLUSION**

19    For the foregoing reasons, the Court should strike the opinions of Drs. Prince,
20 Kennedy, Brogioli, and Kelley.

23

Case No. 3:17-CV-01375-JAH-MDD

Case 1:21-cv-00525-MN-MDD   Document 260-5   Filed 06/07/24   Page 64 of 102 PageID #:
11455
Case 3:17-cv-01375-MS-MDD   Document 465-1   Filed 01/22/18   Page 15 of 300 Page 25 of
11455

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

Dated:  November 27, 2018          Respectfully submitted,

By:  /s/ Robert M. Yeh

Juanita R. Brooks, SBN 75934, brooks@fr.com
Seth M. Sproul, SBN 217711, sproul@fr.com
Frank Albert, SBN 247741, albert@fr.com
Joanna M. Fuller, SBN 266406, jfuller@fr.com
Robert M. Yeh, SBN 286018, ryeh@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Phone:  858-678-5070 / Fax: 858-678-5099

Katherine D. Prescott, SBN 215496,
prescott@fr.com
Betty H. Chen, SBN 24056720,
betty.chen@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Phone: 650-839-5070 / Fax: 650-839-5071

Ruffin B. Cordell, DC Bar No. 445801,
*appearing pro hac vice,* cordell@fr.com
Lauren A. Degnan, DC Bar No. 452421,
*appearing pro hac vice,* degnan@fr.com
FISH & RICHARDSON P.C.
1000 Maine Avenue SW, Suite 1000
Washington, D.C.  20024
Phone:  202-783-5070 / Fax:  202-783-2331

Mark D. Selwyn, SBN 244180,
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING HALE AND
DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Phone: 650-858-6000 / Fax: 650-858-6100

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

| | |
|---|---|
| 1 | William F. Lee, MA Bar No. 291960, appearing *pro hac vice*, william.lee@wilmerhale.com |
| 2 | Joseph J. Mueller, MA Bar No. 647567, appearing *pro hac vice*, joseph.mueller@wilmerhale.com |
| 3 | Timothy Syrett, MA Bar No. 663676, appearing *pro hac vice*, timothy.syrett@wilmerhale.com |
| 4 | Sarah B. Petty, appearing *pro hac vice*, sarah.petty@wilmerhale.com |
| 5 | Louis W. Tompros, appearing *pro hac vice*, louis.tompros@wilmerhale.com |
| 6 | Bradley M. Baglien, appearing *pro hac vice*, bradley.baglien@wilmerhale.com |
| 7 | Dominic E. Massa, appearing *pro hac vice*, dominic.massa@wilmerhale.com |
| 8 | WILMER CUTLER PICKERING HALE AND DORR LLP |
| 9 | 60 State Street |
| 10 | Boston, MA 02109 |
| 11 | Phone: 617-526-6000 / Fax: 617-526-5000 |
| 12 | |
| 13 | Nina S. Tallon, DC Bar No. 479481, *appearing pro hac vice*, nina.tallon@wilmerhale.com |
| 14 | WILMER CUTLER PICKERING HALE AND DORR LLP |
| 15 | 1875 Pennsylvania Avenue NW |
| 16 | Washington, DC 20006 |
| 17 | Phone: 202-663-6000 / Fax: 202-663-6363 |
| 18 | |
| 19 | Matthew Leary, appearing *pro hac vice*, matthew.leary@wilmerhale.com |
| 20 | WILMER CUTLER PICKERING HALE AND DORR LLP |
| 21 | 1225 Seventeenth Street, Suite 2600 |
| 22 | Denver, CO 80202 |
| 23 | Phone: 720-274-3135 / Fax: 720-274-3133 |
| 24 | William A. Isaacson, DC Bar No. 414788, *appearing pro hac vice*, wisaacson@bsfllp.com |
| 25 | Karen L. Dunn, DC Bar No. 1002520, *appearing pro hac vice*, kdunn@bsfllp.com |
| 26 | BOIES SCHILLER FLEXNER LLP |
| 27 | 1401 New York Avenue, N.W. |
| 28 | |

25

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

Washington, DC 20005
Phone: 202-237-2727 / Fax: 202-237-6131

Benjamin C. Elacqua, TX SBN 24055443
*appearing pro hac vice,* elacqua@fr.com
John P. Brinkman, TX SBN 24068091
*appearing pro hac vice,* brinkman@fr.com
Tony Nguyen, TX SBN 24083565
*appearing pro hac vice*, nguyen@fr.com
FISH & RICHARDSON P.C.
One Houston Center, 28th Floor
1221 McKinney
Houston, TX 77010
Phone: 713-654-5300 / Fax: 713-652-0109

Brian P. Boyd, GA SBN 553190,
*appearing pro hac vice,* bboyd@fr.com
Christopher O. Green,
*appearing pro hac vice*, cgreen@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree St. NE, 21st Floor
Atlanta, GA 30309
Phone:  404-892-5005 / Fax:  404-892-5002

Phillip W. Goter, appearing pro hac vice,
goter@fr.com
FISH & RICHARDSON P.C.
60 South Sixth Street, 3200 RCB Plaza
Minneapolis, MN 55402
Phone:  612-335-5070 / Fax:  612-288-9696

Joshua H. Lerner, SBN 220755,
jlerner@durietangri.com
Ragesh K. Tangri, SBN 159477,
rtangri@durietangri.com
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
Phone: 415-362-6666 / Fax: 415-236-6300

Henry Huttinger, SBN 312843,
hhuttinger@durietangri.com

26

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

Peter S. Horn, SBN 321358,
phorn@durietangri.com
DURIE TANGRI LLP
530 Molino Street, Suite 111
Los Angeles, CA 90013
Phone: 213-514-5518 / Fax: 415-236-6300


Attorneys for *Defendant/Counterclaim-Plaintiff APPLE INC.*

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1

<u>CERTIFICATE OF SERVICE</u>

2   The undersigned hereby certifies that a true and correct copy of the above and

3 foregoing document has been served on November 27, 2018 via electronic mail

4 pursuant to Fed. R. Civ. Proc. 5(b) to all counsel of record in this action:

5

6 Karen P. Hewitt / kphewitt@jonesday.com
Randall E. Kay / rekay@jonesday.com
7 JONES DAY
4655 Executive Drive, Suite 1500
8 San Diego, California 92121
Telephone: (858) 314-1200
9 Facsimile: (858) 345-3178
10 **Service email**: Qualcomm-JonesDay-SDCal1375@jonesday.com

11

12 David A. Nelson / davenelson@quinnemanuel.com
QUINN EMANUEL URQUHART &
13 SULLIVAN LLP
500 West Madison St., Suite 2450
14 Chicago, Illinois 60661
Telephone: (312) 705-7400
15 Facsimile: (312) 705-7401
16 **Service email**: qequalcommapple@quinnemanuel.com

17

18 Evan R. Chesler / echesler@cravath.com
CRAVATH, SWAINE & MOORE LLP
19 Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
20 Telephone: (212) 474-1000
Facsimile: (212) 474-3700
21 **Service email**: Service-CSM-QC-Apple-CM@cravath.com

22

23 Mark D. Selwyn
Wilmer Cutler Pickering Hale and Dorr LLP
24 950 Page Mill Road
Palo Alto, CA 94304
25 Telephone: (650) 858-6000
Facsimile: (650) 858-6100
26

27

28 William F. Lee

Case No. 3:17-CV-01375-JAH-MDD

HIGHLY CONFIDENTIAL – ATTORNEYS EYES' ONLY

1    Joseph J. Mueller
     Timothy Syrett
2    Wilmer Cutler Pickering Hale and Dorr LLP
3    60 State Street
     Boston, MA 02109
4    Telephone: (617) 526-6000
     Facsimile: (617) 526-5000
5

6    Nina S. Tallon
     Wilmer Cutler Pickering Hale and Dorr LLP
7    1875 Pennsylvania Avenue NW
8    Washington, DC 20006
     Telephone: (202) 663-6000
9    Facsimile: (202) 663-6363

10
     **Service email:** WHQualcomm-AppleSDCal1375ServiceList@wilmerhale.com
11

12

13        Executed on November 27, 2018, at San Diego, California.

14
                                  /s/ Robert M. Yeh
15                                _____
                                      Robert M. Yeh
16

17

18

19

20

21

22

23

24

25

26

27

28

                                    29
                                                    Case No. 3:17-CV-01375-JAH-MDD

# EXHIBIT 4

Case 1:21-cv-00525-MN-MDD   Document 260-1   Filed 06/07/24   Page 71 of 102 PageID #: 32
Case 3:17-cv-01375-DMS-MDD   Document 504   Filed 09/26/18   PageID.23464   Page 1 of 32
11462

David A. Nelson (*pro hac vice*)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Randall E. Kay (SBN 149369)
rekay@jonesday.com
**JONES DAY**
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1200
Facsimile: (844) 345-3178

*[Additional counsel identified on signature page]*

*Attorneys for Plaintiff and Counterclaim Defendants*
QUALCOMM INCORPORATED AND
QUALCOMM TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INC.,<br><br>                          Plaintiff,<br><br>        v.<br><br>APPLE INC.,<br><br>                          Defendant. | Case No. 3:17-cv-1375-DMS-MDD<br><br>**QUALCOMM'S OPPOSITION TO APPLE'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF DRS. PRINCE, KENNEDY, BROGIOLI, AND KELLEY** |
| AND RELATED COUNTERCLAIMS | Judge:  Hon. Dana M. Sabraw<br><br>Hearing Date: January 11, 2019 |

Case 3:17-cv-01375-MS-MDD   Document 260-504   Filed 06/07/24   Page 72 of 102   PageID #:
Case 3:17-cv-01375-DMS-MDD   Document 504   Filed 02/26/18   PageID.23465   Page 2 of 32
11463

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................... 1

II.     DR. PRINCE'S SURVEY IS RELEVANT AND IS BASED ON
        ESTABLISHED PRINCIPLES AND METHODS ............................. 2

        A.    Dr. Prince's Survey, Conducted on Relevant Topics and Under
              Accepted Principles, Is Admissible ............................................. 3

        B.    Apple's Critiques of Dr. Prince's Work Are Incorrect and
              Contrary to Apple's Own Prior Positions ................................... 6

              1.   Dr. Prince's Survey Is Sufficiently Tied to the Claims ............... 7

              2.   Apple's Claim That The Survey Is Unreliable Because It
                   Does Not Account For Unpatented Features Is Wrong And
                   Contradicted by Apple's Own Prior Statements .......................... 9

II.     APPLE'S ATTACKS ON DR. KENNEDY'S OPINIONS ARE
        UNFOUNDED AND ARE NOT A BASIS FOR EXCLUSION ................... 11

        A.    Dr. Kennedy Provided A Thorough Bargaining Power Analysis
              Supported by Multiple Analytic Methods ................................... 11

        B.    Dr. Kennedy's Opinion Regarding The Cost of ▌▌▌▌
              ▌▌▌ Flash Is Methodologically Sound ................................... 16

III.    DR. BROGIOLI'S TESTIMONY IS RELEVANT AND SHOULD NOT
        BE EXCLUDED ................................................................................ 19

        A.    Dr. Brogioli's Opinions are Relevant to the Issue of Qualcomm's
              Alleged Anticompetitive Behavior ............................................. 19

        B.    Dr. Brogioli Opinions are Proper Expert Testimony ................ 20

IV.     DR. KELLEY'S OPINIONS ON POWER SAVINGS PROVIDE A
        REASONABLE DETERMINATION OF THE BENEFITS ACHIEVED
        BY THE '558 PATENT ..................................................................... 21

        A.    Apple's Challenges Go To The Evidentiary Weight, Not
              Admissibility, Of Dr. Kelley's Opinions ................................... 22

        B.    Apple's Arguments Are Not Supported By The Evidentiary
              Record ....................................................................................... 23

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
   738 F.3d 960 (9th Cir. 2013) ....................................................................3

*Apple Inc. v. Motorola, Inc.*,
   757 F.3d 1286 (Fed. Cir. 2014) .....................................................21, 22, 23

*Apple, Inc. v. Samsung Elecs. Co.*,
   Case No. 5:12-cv-00630-LHK, 2014 WL 794328
   (N.D. Cal. Feb. 25, 2014) .............................................................4, 6, 7, 8

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
   251 F.3d 1252 (9th Cir. 2001) ...................................................................3

*Content Guard Holdings v. Amazon*,
   2015 WL 11089749 (E.D. Tex. Aug. 6, 2015) .........................................15

*Daubert v. Merrell Dow Pharm. Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ...................................................................20

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) .......................18

*Fractus, S.A. v. Samsung*,
   No. 6:09-CV-203-LED-JDL, 2011 WL 7563820 (E.D. Tex. Apr. 29, 2011)..........9

*Fujifilm Corp. v. Motorola Mobility LLC*,
   No. 12-CV-03587, 2015 WL 1737951 (N.D. Cal. Apr. 8, 2015) .................8

*Gaylord v. United States*,
   777 F.3d 1363 (Fed. Cir. 2015) ...............................................................22

*Largan Precision Co. v. Samsung Elecs. Co.*,
   No. 13-CV-2740, 2015 WL 10857530 (S.D. Cal. Nov. 30, 2015) ..............4

*Limelight Networks, Inc. v. XO Commc'ns, LLC*,
   2018 WL 678245 (E.D. Va. Feb. 2, 2018) ..........................................14, 15

*Messick v. Novartis Pharm. Corp.*,
   747 F.3d 1193 (9th Cir. 2014) ...................................................................3

*Micro Chem., Inc. v. Lextron, Inc.*,
   317 F.3d 1387 (Fed. Cir. 2003) ...............................................................18

*MobileMedia Ideas, LLC v. Apple Inc.*,
   209 F. Supp. 3d 756 (D. Del. 2016) ...........................................................9

*NetAirus Techs., LLC v. Apple, Inc.*,
   2013 WL 12322092 (C.D. Cal. Oct. 23, 2013) ........................................8, 9

*Odyssey Wireless, Inc. v. Apple Inc.*,
No. 15-CV-01735, 2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) .................passim

*Sentius Int'l LLC v. Microsoft Corp.*,
5:13–cv–00825–PSG (N.D. Cal. 2015), 2015 WL 331939.....................................10

*Southland Sod Farms v. Stover Seed Co.*,
108 F.3d 1134 (9th Cir. 1997) ....................................................................................3

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015) ..............................................................................3, 8

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
No. 15-cv-2370-JVS-DFM, 2018 WL 4488286 (C.D. Cal. Sept. 14, 2018) ........8, 9

*Townsend v. Monster Beverage Corp.*,
303 F. Supp.3d 1010 (C.D. Cal. 2018) .......................................................................3

*TV Interactive Data Corp. v. Sony Corp.*,
929 F. Supp. 2d 1006 (N.D. Cal. 2013)..........................................................4, 6, 10, 11

*Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*,
No. 10-CV-10578, 2016 WL 5956325 (E.D. Mich. Oct. 14, 2016) .......................11

Case 3:17-cv-00525-WS-MDD   Document 269-4   Filed 06/07/24   Page 75 of 102 PageID #:
11466
Case 3:17-cv-01375-DMS-MDD   Document 690-4   Filed 02/26/18   Page 7 of 469   Page 5 of 32

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Apple's motion asserts challenges that, at most, go to the weight of the testimony. None is a basis for excluding any of the challenged opinions.  The motion should be denied.

First, Apple tries to poke holes in Qualcomm's damages expert opinions, arguing Dr. Prince's survey and Dr. Kennedy's opinions relying thereon are inadmissible. Apple's critiques of the survey fly in the face of many opinions admitting conjoint surveys in smartphone patent litigation.  Apple fails to acknowledge or address its repeated, unsuccessful attempts to exclude similar surveys offered by Dr. Prince, including recently in this Court.  Apple likewise ignores that it has argued opposite positions when offering its own conjoint surveys.  Dr. Prince's survey is relevant and was conducted using widely-accepted methodology.  There is no basis to exclude it.

Second, Apple attempts to mischaracterize Dr. Kennedy's bargaining power analysis, ignoring the in-depth, case specific analysis in his report, misleadingly claiming he adopted an improper rule of thumb.  Not so, as his analysis makes clear. Apple also complains about the quality of the information Dr. Kennedy used to estimate the cost of the flash component the patent enabled Apple to avoid—a quintessential cross-examination argument.  Moreover, Apple ignores that Dr. Kennedy's use of publicly available information was necessitated by Apple's failure to produce any evidence of the cost of this component during discovery.  Apple's complaints about Dr. Kennedy's analysis do not identify any methodological flaw warranting exclusion.

Third, Apple rehashes its motion to strike Dr. Brogioli's expert report—arguing, once again, that Qualcomm should be foreclosed from rebutting Apple's pervasive narrative about Qualcomm's allegedly anticompetitive conduct.  Nowhere in its motion does Apple agree not to offer evidence regarding Qualcomm's licensing policies or their allegedly anticompetitive impact.  Qualcomm is entitled to offer rebuttal testimony from Dr. Brogioli to help the jury understand ███████████████████

████████████████████████████ Rather than address this evidence head-on, Apple asks this Court to exclude Qualcomm's rebuttal from the case.

Finally, Apple challenges Dr. Kelley's opinions regarding the power savings attributable to the '558 Patent. Dr. Kelley relied on documents and testing performed by Qualcomm in the ordinary course of business to compare the power savings attributable to its implementation of envelope-tracking—functionality enabled by the '558 Patent. Apple does not challenge the framework for Dr. Kelley's opinions, nor does it posit different estimated savings or alternative evidence that Dr. Kelley failed to consider. Instead, Apple suggests a different comparison *could* have been performed, an argument that has no place in a *Daubert* motion and which ignores that the comparison it proposes was not feasible.

## II.    DR. PRINCE'S SURVEY IS RELEVANT AND IS BASED ON ESTABLISHED PRINCIPLES AND METHODS

Apple seeks to exclude Dr. Prince's survey on two grounds. First, it argues the survey results are not "linked to the asserted claims" because battery life is allegedly only improved by the asserted patents when the device is "displaying 3D graphics or connecting to distant cell towers," whereas Dr. Prince surveyed the value of battery life during "heavy use of a smartphone." (Mot. at 9.) This argument fails. Dr. Prince measured the value of improvements in battery life, which is exactly what Qualcomm's technical experts identified as the benefit of the inventions, so the results are "linked to the asserted claims." Apple's quibbles about how battery life is described in the survey go to weight, not admissibility. Second, Apple argues the survey results do not identify the value of "the claimed features relative to all unpatented features," and that the willingness-to-pay ("WTP") results are too high. (*Id.* at 12.) This argument fails too. ████████████████████████████, it is impossible to include every smartphone feature in a survey, yet courts have routinely admitted conjoint surveys in smartphone patent cases, including ones offered by Apple. Apple's claim that the survey is flawed because the willingness-to-pay measurements of all phone features could total more than the

1   purchase price of the phone distorts conjoint methodology, is a 180 degree turn from

2   Apple's prior positions, and has been rejected by multiple courts.

3           Apple's motion also ignores three dispositive facts.  First, the law of this Circuit

4   makes clear Apple's criticisms go to weight, not admissibility.  Second, Apple brought

5   and lost a very similar motion to exclude a very similar survey by Dr. Prince in this very

6   Court six months ago.  Third, Apple has offered very similar conjoint surveys as a basis

7   for damages in smartphone patent cases where it was plaintiff—and in opposing *Daubert*

8   motions it has taken (and prevailed on) positions diametrically opposed to those it offers

9   now.  Dr. Prince used an established and widely-used methodology, applied it carefully,

10  consistent with academic literature and case law, and generated reliable results.

### A.    Dr. Prince's Survey, Conducted on Relevant Topics and Under Accepted Principles, Is Admissible

11
12          Apple ignores the standard under which this Court reviews survey analysis on a

13  *Daubert* motion.[1]  In the Ninth Circuit, "[t]he admissibility threshold for survey evidence

14  . . . is notably low."[2]  *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1025

15  (C.D. Cal. 2018).  "The offering party need only show that the survey is relevant and

16  conducted according to accepted principles." *Id.*  "[A]s long as they are conducted

17  according to accepted principles . . . survey evidence should ordinarily be found

18  sufficiently reliable under *Daubert*." *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d

19  1134, 1143 n.8 (9th Cir. 1997).  After the survey is found "relevant and conducted

20  according to accepted principles," the "issues of methodology, survey design, reliability,

21  the experience and reputation of the expert, critique of conclusions, and the like go to

22  the weight of the survey rather than its admissibility." *Clicks Billiards, Inc. v.

23  Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001).

24

25  ---

26  [1]    This Court follows Ninth Circuit law for *Daubert* determinations.  *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1294 (Fed. Cir. 2015).

27  [2]    *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."); *Messick v. Novartis

28  Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) ("Rule 702 should be applied with a 'liberal thrust' favoring admission.").

1    As another trial court in this Circuit held in accepting conjoint surveys offered by
2 Apple, "the framing of questions for purposes of surveys is generally an issue of weight,
3 not admissibility."  *Apple, Inc. v. Samsung Elecs. Co.*, Case No. 5:12-cv-00630-LHK,
4 2014 WL 794328, at *18 (N.D. Cal. Feb. 25, 2014).  Only when "a description of a
5 patent in survey . . . var[ies] so much from what is claimed that the survey no longer
6 'relate[s] to any issue in the case' and is 'not relevant and, ergo, non-helpful,'" should
7 the survey be excluded.  *Id.*; *see also Largan Precision Co. v. Samsung Elecs. Co.*, No.
8 13-CV-2740, 2015 WL 10857530, at *2 (S.D. Cal. Nov. 30, 2015) (denying *Daubert*
9 motion challenging survey).  The selection of features for inclusion in a survey is also a
10 critique that goes to weight, not admissibility.  *TV Interactive Data Corp. v. Sony Corp.*,
11 929 F. Supp. 2d 1006, 1025–26 (N.D. Cal. 2013) (denying motion to exclude conjoint
12 survey where movant argued "exclusion of the majority of product attributes" "led
13 respondents to overvalue each of the product attributes" tested).

14    Dr. Prince's survey easily meets the standards of relevance and acceptable
15 principles.  The value of increased battery life to consumers, a benefit that Qualcomm's
16 technical experts identified for three of the patents-in-suit, is directly relevant to the
17 royalty Apple would pay at a hypothetical negotiation.  (*E.g.*, Ex. 3[3] (Annavaram Rpt.)
18 at 20; Ex. 4 (Baker Rpt.) at 170; Ex. 5 (Kelley Rpt.) at 13, 197.)  Dr. Prince employed a
19 well-accepted and commonly used survey tool called "choice-based conjoint analysis"
20 to assess consumers' willingness-to-pay for various smartphone features.  (Ex. 1 (Prince
21 Rpt.) at 12.)  Conjoint analysis allows companies to understand how consumers value a
22 particular feature.  (*Id.*)  It is frequently used in litigation, including for patent valuation,[4]
23 in commercial settings,[5] and by both policy makers and academic researchers.[6]  Apple
24

25 [3]   All exhibit citations are to the Declaration of Zachary Flood, filed concurrently.
26 [4]   *E.g.*, *Odyssey Wireless, Inc. v. Apple Inc.*, No. 15-CV-01735, 2016 WL 7644790, at *9 (S.D. Cal. Sept. 14, 2016) (admitting conjoint analysis testing value of smartphone upload speed and collecting cases admitting conjoint analyses).
27 [5]   Rao, V., *Applied Conjoint Analysis*, Springer Publishers, 2014 (Ex. 23), at 365; http://www    fsgexperts.com/wpcontent/uploads/2013/01/FSG-IP-Damages-CLE.pdf
28 (Ex. 24), at 3.
   [6]   Rao, V., *Applied Conjoint Analysis*, Springer Publishers, 2014 (Ex. 23), at 365.

itself has used conjoint surveys in patent litigation to value smartphone features.[7]

Dr. Prince's conjoint analysis presented survey respondents with descriptions of different hypothetical smartphones with a range of different features, and asked which device they would prefer. (*Id.*) Dr. Prince conducted interviews and focus groups to ensure the survey correctly identified the features and was understandable to respondents. (*Id* at 14.) Dr. Prince used the relationship between the estimated willingness-to-pay for storage (derived from the survey) and the market price of storage (e.g., $100 more for twice as much storage) to calibrate the survey results, ensuring they provided data as closely tied to real-world decision-making as possible. (*Id.* at 22-23.) Dr. Prince then conducted a series of statistical robustness checks to further validate the results. (*Id.* at 25-26.) In sum, Dr. Prince used established survey methods.

Apple has not addressed that it has twice offered conjoint surveys over *Daubert* challenges and has failed in three prior *Daubert* motions attacking Dr. Prince's methodology. In two separate smartphone patent cases in the Northern District of California, Apple offered conjoint surveys as part of its damages methodologies. 5:11-cv-1846; 5:12-cv-630. In both cases, Apple's expert conducted conjoint surveys containing no more than seven features (including far more minor features than battery life) to generate willingness-to-pay numbers that were used by Apple's damages experts. And in both cases, those surveys were admitted over *Daubert* challenges.

Apple also has challenged surveys by Dr. Prince in three previous cases[8] and each time its *Daubert* motion has been denied. (*See* Ex. 2 (Prince Dep.) at 13:8-12; 14:10-

---

[7]   http://www.fsgexperts.com/wp-content/uploads/2013/01/FSG-IP-Damages-CLE.pdf, at 26-29 (Ex. 24); (*see Apple Inc. v. Samsung Elecs. Co.*, 11-cv-01846-LHK (N.D. Cal.), Dkt. 2130-1 (Ex. 25); *Apple Inc. v. Samsung Elecs. Co.*, 12-cv-00630-LHK (N.D. Cal.), Dkt. 1182. (Ex. 26)).

[8]   (*ContentGuard Holdings, Inc. v. Google Inc. et al.*, 2:14-cv-00061-JRG (E.D. Tex.) Dkt. 298 ("Defendants' dissatisfaction with the description of the patented features in the survey goes to weight, not admissibility") (Ex. 29); *Wi-LAN Inc. v. HTC*, 2:11-cv-00068-JRG (E.D. Tex.) Dkt. 597, at 49, 62 (Defendants argued that "Dr. Prince artificially focuses consumers on a few key functionalities"; the court rejected the challenge: "With regard to Dr. Prince and the Daubert motion concerning his surveys, the Court finds that the Defendant has not shown anything inherently unreliable and that they can adequately respond to the same through cross-examination.") (Ex. 30).)

1    13.)  Indeed, Apple moved to exclude Dr. Prince's survey results in a case before this

2    Court just a few months ago.  (*Apple Inc. v. Wi-LAN Inc.*, 3:14-cv-02235-DMS-BLM

3    (S.D. Cal.), Dkt. 338. (Ex. 27).)  Dr. Prince's survey in that case relied on substantially

4    the same procedure that Dr. Prince applies here, and Apple made substantially the same

5    challenge that it raises again here.  (*See id.*)[9]  In denying that motion, this Court joined

6    the others in finding Dr. Prince's surveys admissible.

7         Apple's motion does not address any of this.  It made no effort to explain how this

8    survey fails where its own conjoint surveys and Dr. Prince's prior ones did not.  That is

9    because both authority and Apple's own prior arguments make clear this challenge is

10   baseless.

11   **B.    Apple's Critiques of Dr. Prince's Work Are Incorrect and Contrary
          to Apple's Own Prior Positions**

12        Apple argues that Dr. Prince's survey results are flawed because his "willingness-

13   to-pay calculations could ***sum*** to a price greater than the price customers pay for an

14   iPhone."[10]  (Mot. at 12.)  However, as Apple previously (and successfully) argued in the

15   Northern District, willingness-to-pay "values ***cannot be simply added up***."[11]  (5:12-cv-

16   00630-LHK (N.D. Cal.), Dkt. 857-3 at 11 ("*Apple v. Samsung Daubert* Opp.") (Ex. 28));

17   *Apple, Inc.*, 2014 WL 794328, at *15 n.7 (accepting Apple's argument that "the

18   willingness-to-pay results of the conjoint survey cannot be added in this way"); *see also*

19   *TV Interactive Data*, 929 F. Supp.2d at 1026 (rejecting the same "extrapolation"

20   argument Apple raises here).  Likewise, Apple argues Dr. Prince's survey is flawed

21   because it did "not include the ***numerous untested factors*** that also influence

22   smartphone purchasing." (Mot. at 13.)  But again, Apple does not disclose it previously

---

[9]    Just as Apple argues here, Apple argued that Dr. Prince's survey did not apportion
the patented features (Ex. 27 at 17-19), that Dr. Prince's willingness-to-pay
calculations could exceed the price of the device (*id.* at 18), and that conjoint surveys
are not reliable under the same cases it cites again here. (*Id.* at 19-23.)

[10]   This is consistent with Apple's conjoint survey in the second *Apple v. Samsung*
case, where the sum of consumers' willingness-to-pay for just five user-interface
patented features was $358.  (5:12-cv-00630-LHK (N.D. Cal.), Dkt. 1993 at 92
(Velluro Rpt.) (Ex. 31).)

[11]   Emphasis in this brief is added unless otherwise noted.

argued that "the literature uniformly recognizes testing ***too many distraction features*** can *cause serious problems*" and has successfully offered conjoint surveys for smartphones testing only seven features. (*Apple v. Samsung Daubert* Opp. at 6.) Apple also argues Dr. Prince's survey questions were too broad relative to the scope of the claims (Mot. at 9), again without acknowledging its previous position that the "precise wording of questions" "go[es] to the ***weight of the survey rather than its admissibility***." ((*Id.* at 9, 11) ("[I]f Samsung contends these [feature] descriptions are inaccurate, that is an issue it can address at trial—it is not an appropriate basis for a motion to exclude.").)

1. Dr. Prince's Survey Is Sufficiently Tied to the Claims

Apple complains that Dr. Prince's survey asked consumers about the value of additional battery life during "heavy use" periods, whereas Apple contends the patent claims only relate to particular use cases, such as "displaying 3D graphics." (Mot. at 9.) According to Apple, because "the survey did not ask about these specific uses," the results should be excluded. (*Id.*) This argument fails across the board.

First, displaying 3D graphics, such as when playing graphically intensive video games, ***is*** a "heavy use" of the device, and tends to drain battery more quickly than when the phone is in standby mode. (Annavarum Rpt. at 20, 155, 158, 220 (describing accused functionalities as "complex, graphics-intensive application programs," "***power-hungry*** high precision math instructions," and the "***most power consuming*** instructions"); *see also* https://www.apple.com/batteries/ (noting that the "single biggest factor affecting battery life and lifespan" are phone activities—comparing "videos and ***games***" to "email and word processing").)

Second, Apple's quibble with Dr. Prince describing 3D graphics-intensive gaming as a "heavy use" is precisely the kind of critique that goes to weight, not admissibility. *See Apple, Inc.*, 2014 WL 794328, at *18 (denying exclusion of Apple conjoint survey and holding that "the framing of questions for purposes of surveys is generally an issue of weight, not admissibility."). Likewise, Apple's complaint that the power savings from each patent are not available in each and every possible use case

7                                    CASE NO. 3:17-cv-1375-DMS-MDD

goes to weight, but more importantly misunderstands how Dr. Prince's survey results are used by Dr. Kennedy. *Id.* (rejecting exclusion of survey unless the "description of a patent in survey . . . var[ies] so much from what is claimed that the survey no longer 'relate[s] to any issue in the case'"). Dr. Kennedy apportions the value of additional battery life measured by Dr. Prince to the specific component's power savings resulting from the patented technology and further apportions that value based on that component's portion of the overall phone power consumption. (Kennedy Rpt. at 47.) There is no requirement that Dr. Prince's survey, which is merely one step in Qualcomm's damages analysis, make every required apportionment. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296-97 (Fed. Cir. 2015) (approving damages expert's multi-step apportionment).

Apple also complains that Dr. Prince did not ask consumers about an improvement in battery life of 19.5 minutes, and instead asked how they valued improvements in larger increments. (Mot. at 11.) This too goes to weight, and ignores Dr. Prince's extensive explanation of why survey interpolation is a well-accepted and reliable methodology appropriately applied here.[12] (Prince Rpt. at 37-38; Prince Dep. at 170-205; *see also Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-CV-03587, 2015 WL 1737951, at *6 (N.D. Cal. Apr. 8, 2015) (rejecting *Daubert* challenge because the surveyed features needed only to "correlate" with the patented technologies).

Apple's reliance on *NetAirus* and *TCL Communications* is misplaced, as neither case involved a conjoint survey. Instead, both excluded an outmoded survey technique that asked direct questions regarding willingness to pay, *i.e.*, "How much would you be willing to pay for [a particular] feature?" *NetAirus Techs., LLC v. Apple, Inc.*, 2013 WL 12322092 (C.D. Cal. Oct. 23, 2013); *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. 15-cv-2370-JVS-DFM, 2018 WL 4488286, at *28 (C.D. Cal. Sept. 14, 2018). In *TCL*, the expert erred because he "focused on one

---

[12] Apple also argues that Dr. Prince's results are non-linear, but Dr. Prince explained in his report that they are linear for the *marginal consumer*. (Prince Rpt. at 37-38.)

1   feature at a time instead of presenting the bundle of phone features consumers evaluate

2   in reality, and also singled out certain features." 2017 WL 6611635, at *29 (citations

3   omitted). As the *TCL* court noted, "[r]esearch shows that asking survey respondents

4   direct questions about their willingness to pay for individual features and feature

5   differences has been shown to be unreliable." *Id.* The *NetAirus* court confronted the

6   same technique (although it didn't identify it as such), and excluded a single question

7   from the survey, which "[i]n contrast to the questions designed to avoid suggesting an

8   answer," directly asked whether Wi-Fi was worth $20. 2013 WL 12322092, at *4. Both

9   *TCL* and *NetAirus* therefore addressed a discredited methodology called "contingent

10  valuation" where the respondents are directly asked to provide the value of a particular

11  feature. That is not what Dr. Prince did here; he did not ask direct questions about value.

12  (Prince Rpt. at 12.) Indeed, Dr. Prince "concluded that this approach was inappropriate"

13  to perform his measurements because surveys using contingent valuation "have been

14  shown to provide unreliable measurements." (Prince Rpt. n. 34.)[13]

15          2.      Apple's Claim That The Survey Is Unreliable Because It Does
                    Not Account For Unpatented Features Is Wrong And Contradicted
16                  by Apple's Own Prior Statements

17          Apple argues Dr. Prince's survey should have "apportioned" the value of battery

18  life against "all unpatented features" in a smartphone. (Mot. at 9.) But accepting this

19  argument would render conjoint surveys inadmissible in all smartphone cases, where the

20  product has hundreds of features, ████████████████████████████████████

21  ████████████████████████████████████████████████████████████████████████

22

---

23  [13]  The out-of-circuit *Fractus* case also provides no help to Apple. First, this one-page,
    unreported opinion from the Magistrate is not based on the Ninth Circuit's survey
24  standard. Further, in that case the survey results tested the value of internal antennas
    as opposed to the actual inventive benefits—"multiband functionality and reduced
25  size." *Fractus, S.A. v. Samsung*, No. 6:09-CV-203-LED-JDL, 2011 WL 7563820, at
    *1 (E.D. Tex. Apr. 29, 2011). There is also no indication that the experts in *Fractus*
26  apportioned those survey results at all. *Id.* In contrast, Dr. Prince's survey directly
    reflects the power efficiency of the inventions as identified by Qualcomm's technical
27  experts, and as discussed the data were apportioned appropriately. *Supra* II.B.1; *see
    also MobileMedia Ideas, LLC v. Apple Inc.*, 209 F. Supp. 3d 756, 765–66 (D. Del.
28  2016) (rejecting Apple *Daubert* motion based on *Fractus* because the survey question
    was "sufficiently tied to [the expert] opinion regarding the benefit of the patent").

11475

1 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮   Surveys valuing selected

2 smartphone features are routinely admitted by courts, including those in this Circuit.

3 *See, e.g.*, *Odyssey Wireless*, 2016 WL 7644790, at *10 (denying *Daubert* motion arguing

4 "the [conjoint] survey focuses on only certain attributes of a smartphone").   Apple

5 successfully opposed a *Daubert* on precisely this ground while using a conjoint survey

6 to value smartphone features far smaller than battery life.  (*Apple v. Samsung Daubert*

7 Opp.)  And, as discussed above, Dr. Prince's survey measurements are just part of

8 Qualcomm's damages analysis.

9 As explained above, Dr. Prince went to great lengths to identify an appropriate set

10 of features to survey, and Apple identifies no methodological flaws with his selection,

11 other than his choice not to include an impossibly large set of survey features.  (*Cf. Apple*

12 *v. Samsung Daubert* Opp. at 6 ("[T]he literature uniformly recognizes testing **too many**

13 **distraction features can cause serious problems**. Indeed, . . . long questionnaires lead

14 to survey exhaustion and poor results.").)  As Apple has recognized in the past, "typical

15 full-profile conjoint studies in practice . . . involve about six or fewer attributes." (*Id.* at

16 7.)  This is precisely what Dr. Prince has done.  *See also Apple Inc.*, 929 F. Supp. 2d at

17 1025-26 (citing literature stating testing fewer variables in a conjoint leads to "better

18 predictive value" and prevents respondents from being "overwhelmed by too much

19 data.").  In any case, feature selection goes to weight, not admissibility.  *TV Interactive*

20 *Data Corp.*, 929 F. Supp. 2d at 1025–26; *Sentius Int'l LLC v. Microsoft Corp.*, 5:13–cv–

21 00825–PSG (N.D. Cal. 2015), 2015 WL 331939 at *5 (denying motion to exclude

22 survey that "asked respondents only about their preferences for the two accused features

23 when the accused products include thousands of features").

24 The *Oracle* case Apple cites is inapposite because, **as Apple itself has previously**

25 **explained**, the expert in *Oracle* predicted market share rather than measuring diminished

26 demand as Dr. Prince did here.  (*Apple v. Samsung Daubert* Opp. at 4.)  As Apple argued,

27 the difference between predicting market share and measuring diminished demand is not

28 "semantic or insubstantial—they are fundamentally different concepts."   (*Id.*)

Furthermore, as other courts have discussed, in *Oracle* "the expert tested seven features in the analysis, three of which were covered by the patented technology, and four of which were not . . . [but] the expert offered no principle[d] basis for selecting the four non-patented features for inclusion in the analysis." *TV Interactive*, 929 F. Supp. 2d at 1026. What Dr. Prince did is distinguishable because, just as in *TV Interactive*, he "conducted his conjoint analysis in two phases," where he first established a "principled basis for choosing the [] features which would be tested alongside [patented features]" and then measured the "[patented] values relative to the other features." *Id.*; *supra* (describing principled basis for choosing features).[14]

## II.    APPLE'S ATTACKS ON DR. KENNEDY'S OPINIONS ARE UNFOUNDED AND ARE NOT A BASIS FOR EXCLUSION

Apple's motion challenges Dr. Kennedy's bargaining power analysis and his opinion regarding the cost of the flash component Apple was able to avoid by using the patented invention of the '949 patent. Apple fundamentally mischaracterizes Dr. Kennedy's bargaining power analysis, and its challenge to Dr. Kennedy's flash cost opinion is an improper attempt to package cross-examination arguments as methodological issues that also ignores its own failure to produce relevant cost information. Neither challenge has merit.[15]

### A.    Dr. Kennedy Provided A Thorough Bargaining Power Analysis Supported by Multiple Analytic Methods

After calculating the incremental profits attributable to the infringing features of the patents-in-suit, Dr. Kennedy performed an in-depth analysis of Apple and Qualcomm's relative bargaining power to determine how the parties would split those

---

[14]    Apple also relies on an out-of-circuit case for its apportionment argument, but in *Visteon* the court excluded the survey expert because in that survey "the only 'value' expressed . . . [was] the relative value of the four asserted patented features to *one another*." *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-CV-10578, 2016 WL 5956325, at *6 (E.D. Mich. Oct. 14, 2016). Dr. Prince's survey, by contrast, covered many other important non-patented features, including price, screen size, storage, and brand.

[15]    Apple also seeks to exclude Dr. Kennedy's opinions relying on Dr. Prince's survey (Mot. at 17) based on its meritless attacks on Dr. Prince's survey. For the reasons set forth *supra* at Section I, Apple's request must be rejected.

incremental profits at the hypothetical negotiation.  (Ex. (Kennedy Rpt.) at 90-98.)  In addition to his *Georgia-Pacific* analysis, which also addresses issues relevant to bargaining power, Dr. Kennedy analyzed a "number of factors that influence bargaining power":

> Those factors include: financial indicators (███████████ ████████████) that are slightly in Apple's favor; Qualcomm's lower weighted average cost of capital suggesting a slightly higher share of the incremental profits for Qualcomm under the Rubinstein model; ███ ███████████████████████████████████.

(*Id.* at 98.)

Specifically, Dr. Kennedy analyzed relevant financial metrics such as the parties' revenues, profitability, cash position, R&D expenditures and credit ratings, and concluded that "[s]ome metrics are neutral, but Apple is somewhat larger, has more cash and has a higher credit rating than Qualcomm." (*Id.* at 90-91.)  The financial metrics he analyzed included factors identified by ████████████████████████████ ████████████████████ as important to Apple in licensing negotiations.  (*Id.* at 91, 95-96.)

Dr. Kennedy also applied the well-regarded and litigation-tested bargaining model developed by Ariel Rubinstein ("Rubinstein model").  (*Id.* at 91.)  The Rubenstein model considers the relevant discount factor for each party in a potential negotiation—often through a party's weighted average cost of capital ("WACC")—in determining the ultimate outcome of the negotiation.  (*Id.* at 91-92.)  Dr. Kennedy determined Qualcomm's WACC at the time of the first hypothetical negotiation was ███% while Apple's was ███%, "implying a profit split ████████████████████████ ███████████████" (*Id.* at 94.)  Dr. Kennedy determined Qualcomm's WACC at the time of the later hypothetical negotiation for the '936 patent was ███% while Apple's was ███%, "implying a profit split █████████████████████████████████ █████" (*Id.* at 94.)  As discussed below, Dr. Kennedy prepared a second set of calculations relaxing the assumption that Qualcomm would move first in the negotiations, which lowered Qualcomm's percentage.  His analysis resulted "████

1 ██████████████████████████████████████████████" for each
2 of the two hypothetical negotiations. (*Id.*) This result was consistent with Dr.
3 Kennedy's broader financial metric analysis: "[a]s expected, two large, profitable
4 operating companies, each with ample resources, have roughly balanced shares of the
5 incremental profits to be split in the hypothetical negotiation." (*Id.* at 94-95.) Dr.
6 Kennedy also considered the impact of Apple's prior litigation positions; specifically,
7 that it had previously sought per unit royalty rates ranging from $1.61 up to $15
8 including for a patent with claimed benefits comparable to those of the '949 Patent. (*Id.*
9 at 97-98.)

10 　　Based on all of these considerations, Dr. Kennedy concluded "Apple and
11 Qualcomm's relative bargaining power would be balanced and support an equal split of
12 incremental profits." (*Id.* at 98.) Notwithstanding that Dr. Kennedy's report sets forth
13 all of his analysis in detail, Apple's motion mischaracterizes Dr. Kennedy's analysis and
14 wrongly asserts it is "untethered to the facts of the case," based "on unjustifiable
15 assumptions," and constitutes an "inappropriate rule of thumb" 50-50 split "with no
16 basis at all." (Mot. at 15-17.) None of that is accurate.

17 　　<u>First</u>, Dr. Kennedy's in-depth bargaining power analysis *is* tied to the facts of the
18 case. Dr. Kennedy analyzed the parties' financial metrics *at the times of the hypothetical*
19 *negotiations*, ████████████████████████. (*Id.* at 90-
20 91.) His analysis under the accepted Rubinstein model "incorporates *company-specific*
21 information to generate a quantitative split of incremental profits." (*Id.* at 94-95.)
22 Further, Dr. Kennedy analyzed the assumptions underlying the Rubinstein model and
23 concluded they were largely "consistent with the assumptions of the hypothetical
24 negotiation." (*Id.* at 93-94.) For the one assumption he identified as not as consistent
25 with the hypothetical negotiation here—the first mover advantage—he adjusted and
26 accounted for it. (*Id.*) Dr. Kennedy also analyzed other case-specific factors influencing
27 bargaining power, such as the non-quantified benefits of the patented technology, which
28 are specific to the infringing features but were not included in the incremental profits to

1    be split.  (*Id.* at 95.)  Apple's claim that Dr. Kennedy's opinion is untethered to this case

2    cannot be squared with the actual substance of his analysis.

3           Second, Dr. Kennedy properly assessed the Rubinstein model as one data point in

4    his broader bargaining power analysis.  As an initial matter, Apple does not argue the

5    Rubinstein model is fundamentally improper.  Nor could it;[16] not only has it been used

6    in litigation for this purpose, Apple's damages expert here has used it in the past ████

7    ██████████████████████████████████████████████████████████████████████████

8    ██████  (Ex. 7 (Prowse Dep.) at 199:22-200:2, 201:1-6.)  Rather, Apple picks at a few

9    common sense assumptions and mischaracterizes the way Dr. Kennedy applied and

10   relied on the model.

11          Apple's complaints about Dr. Kennedy's supposedly "unjustified assumptions,"

12   including that "Apple would prefer to get access to the licensed patents sooner rather

13   than later," that "there is an increasing cost to delay," that "the parties to the negotiation

14   make sequential offers and counteroffers," and that "Apple and Qualcomm would have

15   an equal chance of being first mover in the negotiation," are a stretch on their face.  (Mot.

16   at 15-16.)  These assumptions are not only justified—they are rooted in common sense

17   and basic financial economics which dictates that receiving a dollar today is worth more

18   than a dollar tomorrow.  They are also essential to the hypothetical negotiation construct,

19   which assumes the parties are willing licensors and licensees.[17]

20          Apple's assertion that Dr. Kennedy's use of the Rubinstein model is flawed in the

21   same way the *Limelight* court found Dr. Prowse's—Apple's damages expert here—

22

23   _____

     [16]   The Rubinstein model is a well-regarded, peer-reviewed approach to assessing the
24   outcome of a negotiation.  (*See, e.g.*, Martin J. Osborne and Ariel Rubinstein,
     Bargaining                  and                  Markets                  (1990),
25   https://pdfs.semanticscholar.org/db16/6725b7b6b8a553cacf43a536cb3f815180ab.pdf
     ; Rubinstein, A. (1982), "Perfect Equilibrium in a Bargaining Model," *Econometrica*,
26   50 (1) pg. 97-100, http://arielrubinstein.tau.ac.il/papers/11.pdf.)
     [17]   Apple also mischaracterizes Dr. Kennedy's reliance on these assumptions.  They
27   are premises of the Rubinstein model, not overall assumptions underlying Dr.
     Kennedy's opinions.  As discussed *infra*, Dr. Kennedy examined these premises and
28   concluded they were consistent with the facts of this case and the hypothetical
     negotiation construct.

1  completely ignores the difference in how Dr. Prowse and Dr. Kennedy used that model
2  in their analyses.  In *Limelight*, "to determine how the parties would split the revenues,
3  [Dr.] Prowse *relied on* Rubenstein's model," and applied a "modified version of the
4  Rubinstein model to predict the results of the hypothetical negotiation and determine
5  how the parties would split" incremental revenues.  *Limelight Networks, Inc. v. XO*
6  *Comm'ns, LLC*, 2018 WL 678245, at *3 (E.D. Va. Feb. 2, 2018).[18]  Unlike Dr. Prowse
7  in *Limelight*, Dr. Kennedy analyzed the Rubinstein model as only one part of his holistic
8  bargaining power analysis.  He did "not consider the Rubinstein model, and the
9  underlying WACCs generating the profit splits, ***in isolation.***"  (Kennedy Rpt. at 95.)
10  Instead, his ultimate multifaceted opinion "stands without relying upon the Rubinstein
11  model," which served as a check "provid[ing] additional support for my conclusion that
12  Qualcomm's and Apple's bargaining power and split of profits would be balanced." (*Id.*
13  at 94-95.)

14      Dr. Kennedy's use of the Rubinstein model is far more akin to the analysis upheld
15  in *Content Guard Holdings v. Amazon*, 2015 WL 11089749 (E.D. Tex. Aug. 6, 2015).
16  The *Content Guard* court rejected a challenge to a damages expert's use of the
17  Rubinstein model, explaining the expert properly "identifie[d] the premises of the
18  Rubinstein model and attempt[ed] to explain how they appl[ied] to the facts of this
19  particular case."  2015 WL 11089749, at *8.  That is what Dr. Kennedy did here.  He
20  undertook an in-depth evaluation of the model's assumptions and concluded they were
21  largely "consistent with the assumptions of the hypothetical negotiation."  (Kennedy
22  Rpt. at 93.)  For example, Dr. Kennedy explained that the model's assumption that "both
23  parties are assumed to have positive rates of time preference, was "easily satisfied and
24  confirmed by measurement of Qualcomm and Apple's discount rates."  (*Id*.)  Dr.
25  Kennedy did not blindly accept the Rubinstein model's premises.  Indeed, with respect
26
27
28

---

[18]  The *Limelight* court made clear the Rubinstein model was "potentially admissible" and was not "a rule of thumb or a 50-50 split"—it simply rejected Dr. Prowse's particular use of it.  *Limelight*, at *2.

1    to the model's assumption of a first-mover advantage, because the hypothetical

2    negotiation is silent as to this assumption Dr. Kennedy *adjusted* his analysis to assume

3    "Apple and Qualcomm would have an equal chance of being the first mover." (*Id*. at

4    93-94.)

5        Finally, despite devoting two pages of its motion to attacking Dr. Kennedy's

6    Rubinstein analysis and its resulting ████ split ██████████, Apple's primary

7    complaint appears to be that Dr. Kennedy did not adopt that specific split. (Mot. at 16.)

8    Apple misleadingly argues that ████████████████████████████████████

9    ████████████████████████████████████████████████████████████████

10   ██████ (Mot. at 16.)  Not so.  As discussed above, Dr. Kennedy relied on multiple

11   analytic approaches to assess bargaining power including (1) comparing the parties'

12   financial metrics, ████████████████████████████████████

13   ██████, (2) applying the Rubinstein bargaining model in light of the parties' WACC's,

14   (3) distilling the negotiation-specific implications of his broader *Georgia-Pacific*

15   analysis, and (4) considering Apple's prior litigation history. (Kennedy Rpt. at 90-98.)

16   Nor did he "reject" the results of his Rubinstein analysis, as his report makes clear. (*Id*.

17   at 94-95 (noting the Rubinstein model analysis "does provide additional support for my

18   conclusion").)   Dr. Kennedy's Rubinstein analysis simply resulted in a range of

19   bargaining splits very close to 50-50, which provided further support for his ultimate

20   conclusion that an even split was appropriate.  That Apple does not like the resulting

21   even split does not make it a "rule of thumb."   Apple's attacks on Dr. Kennedy's

22   bargaining power analysis are meritless.

23       **B.    Dr. Kennedy's Opinion Regarding The Cost of ████████████
             Flash Is Methodologically Sound**

24

25   Dr. Kennedy calculated the incremental profit associated with the '949 Patent's

26   flashless boot functionality by measuring the cost of the ████████████ flash

     component that Apple was able to avoid including in each infringing iPhone through its

27   use of the '949 patented technology. (Kennedy Rpt. at 4-5.) Dr. Kennedy had to comb

28

                                          16                    CASE NO. 3:17-cv-1375-DMS-MDD

1  through publicly available information about the price of this component because
2  "Apple has not produced documents from which [he could] sufficiently determine the
3  cost of a ███████████ flash to Apple at the time of the hypothetical negotiation."
4  (*Id*. at 53-54.)

5       Qualcomm propounded document requests that should have captured Apple
6  documents reflecting the cost of this component.  Qualcomm's requests in the ITC
7  companion case included those for "documents reflecting Apple's analysis, review, and
8  evaluation of flashless booting . . . including but not limited to [the] value of eliminating
9  the need for a separate flash memory for modem processors." (Ex. 8 (ITC RFP No. 67).)
10 Qualcomm's requests in this action included those for documents and communications
11 "reflecting, comprising, or discussing any benefit, *such as in terms of cost or area*
12 *savings, of employing a modem processor without an associated flash memory.*" (Ex.
13 9 (RFP No. 146).)  Apple agreed to produce in response to these requests.  (Ex. 10
14 (Apple's Response to RFP No. 146).)  Qualcomm also propounded an interrogatory
15 asking Apple to provide any costs it intended to rely upon in this litigation.  (Ex. 11
16 (Special Rog No. 15).) ████████████████████████████████
17 ████████. (*Id*.)  Further, █████████████████████████████
18 ███████████████████████████████████████████████████████
19 ███████████████████████████████. (Ex. 12 (Garg Dep. Tr.) at 17:11-
20 18:1, 24:18.)

21       As a result of Qualcomm's inability to obtain this information in discovery, Dr.
22 Kennedy identified the only publicly available cost information about the most
23 comparable flash component and adjusted that cost to account for different memory
24 capacities and for changes in flash pricing over time.  (Kennedy Rpt. at 53-54.)  Based
25 on this, Dr. Kennedy concluded ███████████ flash would have cost $████ per unit
26 at the time of the hypothetical negotiation.  (*Id*.)  After failing to identify the cost of the
27 cost of this component in discovery, Apple now seeks to exclude Dr. Kennedy's opinion
28 as to the cost of that component based solely on its claim that the information Dr.

1  Kennedy used to estimate that cost is imperfect.  (Mot. at 17-18.)  Apple's complaint is

2  not only one of its own making, it is one properly addressed through cross examination,

3  not a *Daubert* motion.  Dr. Kennedy's reliance on publicly available information to

4  estimate the cost of this component is not a methodological flaw, which is confirmed by

5  Apple's lack of supporting authority.

6       Apples cites zero authority for its position that the only permissible cost evidence

7  must have come through Apple itself.  Nor could it.  Disputes regarding the proper source

8  of cost information in a situation like this are quintessentially issues of fact that belong

9  before a jury.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786,

10  2798, 125 L. Ed. 2d 469 (1993) (noting the "traditional and appropriate means" of

11  attacking imperfect but admissible evidence is through "[v]igorous cross-examination,

12  presentation of contrary evidence, and careful instruction on the burden of proof."); *see

13  also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("When

14  … the parties' experts rely on conflicting sets of facts, it is not the role of the trial court

15  to evaluate the correctness of facts underlying one expert's testimony.").

16       Additionally, while Apple criticizes Dr. Kennedy's reliance on public cost

17  information, Apple itself has *still* failed to present *any* evidence as to the cost of this

18  flash component.  In his rebuttal to Dr. Kennedy's report, Apple's expert Dr. Prowse —

19  who enjoys unfettered access to Apple—presented no alternative cost information for

20  ▮▮▮▮▮▮▮ flash.  

25  (Ex. 14 (Rinard Rpt.) at 298;

26  Ex. 15 (APL-QC1065_00594682) at -700); Ex. 16 (APL-QC1065_00594134) at -155.)

27       Determining a component cost through publicly available sources is not a

28  methodological flaw.  Apple is free to cross examine Dr. Kennedy about its

Case 3:21-cv-00525-MN MDD Document 269-4 Filed 06/07/24 Page 92 of 102 PageID #: 32
Case 3:17-cv-01375-DMS-MDD Document 504 Filed 12/23/19 PageID.23466 Page 92 of 32
11484

disagreement with his cost estimate, but that disagreement is not a basis for exclusion.

## III.  DR. BROGIOLI'S TESTIMONY IS RELEVANT AND SHOULD NOT BE EXCLUDED

Apple's motion is a rehash of its motion to strike Dr. Brogioli's expert report. While Apple describes its motion to strike as based on "procedural grounds" (Mot. at 18 n.8), the bottom line is that both motions are premised on the same argument-- the alleged irrelevancy of Dr. Brogioli's testimony.  But Dr. Brogioli's testimony is relevant to an issue *Apple* chose to inject into this case: Qualcomm's allegedly anticompetitive conduct.  (*See* Dkt. 115 at 22–23.)  Qualcomm is entitled to rebut Apple's arguments by establishing that Qualcomm is an innovator in baseband chipset design.

### A.  Dr. Brogioli's Opinions are Relevant to the Issue of Qualcomm's Alleged Anticompetitive Behavior

Apple argues Dr. Brogioli's opinions are "not relevant to any issue in this case." (Mot. at 19.)  But since the outset of this case, Apple has claimed this is "not an ordinary patent case" because "Qualcomm has employed a host of sales and licensing practices designed to impairs its competitors[]" in order to "cement" its market position because "Qualcomm has never been an industry leader for technologies outside of earlier cellular standards." (Dkt. 115 at 22–23.)  Apple has pursued, and has indicated it will continue to pursue, these theories throughout this case.  (*See* Dkt. 462-7; Dkt. 462-8 at ¶ 152; Dkt. 462-9 at 7-31.)  Dr. Brogioli's testimony is relevant to these theories.

Contrary to Apple's suggestion that its statements in its CMS (Dkt. 115) eleven months ago are not representative of its theories in this case (Mot. at 19-20), Apple has pursued those same theories ████████████████████████████████████████████
█████████████████████████████████████████.  Dr. Brogioli's testimony serves to rebut those theories, not with mere "inflammatory innuendo," but with a detailed analysis of facts ████████████████████████████████████████████████
████████████████████████████████, allowing Intel to develop a product that could compete, technically, with Qualcomm's innovative offering.  (*See* Ex. 17 (Brogioli Rpt.) at 54-71.)  Because Dr. Brogioli's testimony "speaks clearly and directly to an

1   issue in dispute in the case"—Qualcomm's alleged anticompetitive behavior—and

2   includes an analysis of facts relating to that issue, there is no legitimate concern that it

3   could "mislead the jury."  (Mot. at 20.)  *See Daubert v. Merrell Dow Pharm. Inc.*, 43

4   F.3d 1311, 1321 n.17 (9th Cir. 1995) (scientific expert testimony should not be excluded

5   if "it speaks clearly and directly to an issue in dispute in the case, and … will not mislead

6   the jury").

7        Apple's withdrawal of its equitable defenses of patent misuse and unclean hands

8   does not mean Dr. Brogioli's testimony is irrelevant.  Apple ignores that, despite

9   withdrawing those defenses, Apple has stated its intent to introduce evidence relating to

10   Qualcomm's allegedly anticompetitive conduct at trial.  (Dkt. 462-7.)  Dr. Brogioli's

11   testimony remains relevant to Apple's claims of anticompetitive conduct, irrespective of

12   Apple's formal withdrawal of its defenses.

13      **B.**    **Dr. Brogioli Opinions are Proper Expert Testimony**

14        Apple's second argument is that Dr. Brogioli's opinions are allegedly not expert

15   testimony.  (Mot. at 20-21.)  To support its position, Apple relies on a gross

16   mischaracterization of ALJ Pender's decision in ITC Investigation No. 1065 excluding

17   Dr. Brogioli's testimony.  (Mot. at 20.)  In that decision, ALJ Pender found that Dr.

18   Brogioli's witness statements were "procedurally deficient" because Qualcomm had not

19   "proferred him as an expert witness nor identified the subject matter of his expertise."

20   (Dkt. 465-19 at 4.)  In addition, ALJ Pender based his opinion on Dr. Brogioli's failure

21   to "discuss[] the statutory public interest factors []or explain[] the relevance of the

22   documents he discusses to those factors."  (*Id.* at 4.)  But because this is not an ITC case,

23   Dr. Brogioli's expert reports do not suffer from the procedural deficiencies that ALJ

24   Pender identified.[19]

25   ███████████████████████████

26

27   ―――――――――――――――

[19]   Indeed, in the second ITC Investigation between the parties, Apple's *Daubert* motion was ***denied*** and Dr. Brogioli was ***allowed to testify***.  (Mot. at 19 n.10.)  Here,

28   Dr. Brogioli's testimony relates to substantially the same evidence from Apple's Radar system.  Just as in 337-TA-1093, his testimony should not be excluded.



Without Dr. Brogioli's testimony, this technical evidence would not be understandable by the jury.

## IV. DR. KELLEY'S OPINIONS ON POWER SAVINGS PROVIDE A REASONABLE DETERMINATION OF THE BENEFITS ACHIEVED BY THE '558 PATENT

Apple does not challenge the reliability of Dr. Kelley's general methodology, namely, determining the benefits attributable to the '558 patent at a device (*e.g.*, smartphone) level based on power savings achieved in the radio-frequency power amplifier ("RF PA") of the device. Rather, Apple disputes select factual underpinnings of Dr. Kelley's opinion. While Apple's challenges are incorrect on their face, they at best go to the weight of Dr. Kelley's opinions, not admissibility, and thus should be reserved for cross-examination. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) ("[Q]uestions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'") (citation omitted).

The substance of Dr. Kelley's opinions is based on a sound and unchallenged methodology. The Accused Products introduced at the time of the hypothetical

Case 3:17-cv-01375-MSM-DDC Document 269-4 Filed 06/27/24 Page 96 of 102 PageID # 32
Case 3:17-cv-01375-DMS-MDD Document 504 Filed 12/23/24 PageID.23469 Page 96 of
11487

1  negotiation were mobile devices that used the '558 patent's inventions to perform

2  envelope tracking ("ET") for Long-Term Evolution ("LTE"), a wide bandwidth and

3  "power hungry" communication standard. Dr. Kelley opined that the '558 inventions

4  were foundational for performing ET on a mobile device, and based on that opinion used

5  measured power performance data for Qualcomm's commercial products, including the

6  QFE1100—the first commercial ET chip that also supported LTE.[20]

7       Apple attacks Dr. Kelley's opinions in two ways. First, Apple contends that Dr.

8  Kelley should have determined the power savings by comparing a QFE1100-based

9  mobile device with an earlier collaboration between Qualcomm and Apple that did not

10  practice the '558 patent (*i.e.*, the QET8001), rather than with a device performing

11  "average power tracking" ("APT"). (Mot. at 22.) Apple contends that such a

12  comparison would have provided a more accurate representation of power savings than

13  the one performed by Dr. Kelley. (*Id.*) Second, Apple asserts that, in determining the

14  device-level power savings attributable to the RF PA, Dr. Kelley purportedly did not

15  account for the time the Accused Products operate outside of ET mode. (*Id.* at 22-23.)

16  Both of Apple's challenge are—at best—based on disputed factual underpinnings of Dr.

17  Kelley's analysis, not his methodology. Accordingly, Apple's *Daubert* challenge

18  against Dr. Kelley should be rejected.

### A.   Apple's Challenges Go To The Evidentiary Weight, Not Admissibility, Of Dr. Kelley's Opinions

19  

20       As an initial matter, Apple's challenges fall outside of *Daubert* because they go

21  to the evidentiary weight, not admissibility, of Dr. Kelley's opinion. The law is well-

22  settled that "questions regarding which facts are most relevant or reliable to calculating

23  a reasonable royalty are 'for the jury.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286,

24  1315 (Fed. Cir. 2014) (citations omitted). "[E]stimating a 'reasonable royalty' is not an

25  exact science." *Id.* Furthermore, "[i]t is common for parties to choose different, reliable

26  

27  

28  

---

[20]    Ex. 5 (Kelley Rpt.) ¶332; Ex. 19 (QCAppleITC-06792481) at slide 11; Ex. 19 (Marra 1065 WS) at Q136 ("The selective boost and offset ideas that we described in the '558 patent were key innovations that made the QFE1100 possible ….").

Case 3:21-cv-00525-MN Document 263-4 Filed 06/03/24 Page 97 of 102 PageID # 32
Case 3:17-cv-01375-DMS-MDD Document 484 Filed 12/28/23 PageID.23450 Page 27 of
11488

1 approaches in a single case and, when they do, the relative strengths and weaknesses

2 may be exposed at trial or attacked during cross-examination." *Id.*; *see also Gaylord v.*

3 *United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015) ("Determining a reasonable royalty

4 does not require 'mathematical exactness,' but a 'reasonable approximation' under the

5 circumstances of a given case.). Thus, the focus of admissibility should be whether the

6 expert testimony was "the product of reliable principles and methods," not whether it

7 "produced a correct degree of estimation." *Apple*, 757 F.3d at 1320.

8      Here, Apple does not challenge the reliability of Dr. Kelley's general

9 methodology, *i.e.*, (1) assessing the power savings in the relevant component (*i.e.*, the

10 RF PA) attributable to the '558 invention and (2) translating that number into the device-

11 level power savings. Rather, Apple disputes a few hand-picked factual and technical

12 underpinnings of Dr. Kelley's opinion. For example, Apple implicitly accepts Dr.

13 Kelley's methodology for comparing a product implementing the invention to a

14 benchmark, but merely differs on what benchmark is the "correct comparison." (Mot.

15 at 22.) Even if one were to accept Apple's argument that the QET8001 would have been

16 a more accurate benchmark, which as explained below is unsupported, that is not

17 grounds to exclude Dr. Kelley's opinions. *See Apple*, 757 F.3d at 1714-15 ("That one

18 approach may better account for one aspect of a royalty estimation does not make other

19 approaches inadmissible."). Similarly, Apple does not contest Dr. Kelley's

20 methodology for determining that the RF PA conservatively accounts for 18.4% of total

21 device power, and in fact does not even dispute the 18.4% number itself. Rather, Apple

22 merely argues that the 18.4% should be further reduced to account for the times when

23 ET is not used. (Mot. at 22-23.) But that only relates to "the correct degree of

24 estimation" and should be reserved for the jury. *Apple*, 757 F.3d at 1718. Apple's

25 attempt to preclude Dr. Kelley's testimony on these issues should be rejected.

26     **B.**    **Apple's Arguments Are Not Supported By The Evidentiary Record**

27     Even if the Court were to delve into the factual underpinnings that Apple

28 improperly challenges here, it would show that Apple's arguments are not supported by

1   the evidentiary record. First, Apple's argument that Dr. Kelley did not perform the

2   "correct comparison" hinges on Apple's assertion that the QET8001 was "readily

3   available" for testing. (Mot. at 22.) However, Apple provides no evidence that the

4   QET8001 was readily available. Apple's contention fails for this reason alone. *See*

5   *Odyssey Wireless*, 2016 WL 7644790, at *7 (rejecting Apple's contention that a different

6   test should have been performed where defendants "fail[ed] to support this contention

7   with any evidence in the record showing that such a test or simulation is possible or

8   practical"). In fact, the undisputed evidence shows that the QET8001 was never

9   commercialized because Apple cancelled the project during the development stage. (*See*

10   Ex. 33 (Mathe Dep. Tr.) 285:4-8 (testifying that Apple cancelled the QET8001 project);

11   Ex. 18 (QCAppleITC-06792481) at 13 ("[T]he [QET8001] project was cancelled").)

12   Thus, contrary to Apple's assertion, it would not have been possible or practical to

13   conduct Apple's hypothetical testing.

14       Apple's hypothetical comparison also would not have been appropriate because

15   the QET8001, unlike the Accused Products and the QFE1100, did not support LTE. (*See*

16   Ex. 19 (Marra 1065 WS) at Q51 ("the QFE1100 added support for LTE.").) Because

17   LTE uses more power and has much higher bandwidth than 3G, it is far more challenging

18   to implement ET for LTE than 3G. (*Id*; Ex. 5 (Kelley Rpt.) at 208.) As a result, any

19   data comparing the QFE1100 to the QET8001 would improperly reflect the different

20   power requirements of LTE and 3G rather than the power savings due to the '558

21   invention, and therefore the QET8001 would have been a far less effective benchmark

22   in determining the relevant power savings in the Accused Products. By comparison, Dr.

23   Kelley's reliance on documents reflecting testing performed by Qualcomm in the

24   ordinary course of business for the purpose of developing and commercializing its

25   embodying ET chips offers a much more reliable estimate of the power savings

26   attributable to the '558 Patent.

27       Lastly, Apple argues that Dr. Kelley's 18.4% figure (based on the power

28   consumption by a power amplifier) is overstated because it purportedly includes time

1   when the mobile device is not in ET mode.  (Mot. at 23.)  Based solely on testimony of

2   Apple employee Ron Dimpflmaier that ████████████████████████████████████████



12  Moreover, any negligible impact of the time not using ET while operating at this

13  much lower RF PA power is more than accounted for by the conservative approach used

14  by Dr. Kelley in his analysis.  For instance, in apportioning the total power consumption

15  to the power consumed by the cellular components based on the *Carroll*'s studies, Dr.

16  Kelley took the average of all use cases (43.6%), despite acknowledging that the more

17  applicable use case for ET would be the "business" case, in which cellular accounts for

18  51% of the total power.  (*See* Kelley Rpt. at 208.)  Dr. Kelley noted that 43.6% is a

19  conservative estimate also because *Carroll* involves a GSM device, which is less power

20  hungry than LTE devices like the Accused Products.  (*Id*. at 209.)  Dr. Kelley was also

21  explicit that estimating the RF PA power consumption at the same level as the baseband

22  processor is conservative, given that an RF PA consumes far more power than the

23  baseband at higher power transmissions, which are when ET is most beneficial and thus

24  the most relevant cases.  (*Id*. at 214.)

25  Accordingly, Apple's attempts to exclude Dr. Kelley's opinions on power savings

26  by the '558 patent should fail for being based on inappropriate grounds for a *Daubert*

27  challenge and contrary to the evidentiary record.

28

| 1 | DATED: December 28, 2018 | Respectfully Submitted, |
|---|---|---|

2

3 By */s/ Valerie Lozano*

4 JONES DAY
Karen P. Hewitt (SBN 145309)
5 kphewitt@jonesday.com
Randall E. Kay (SBN 149369)
6 rekay@jonesday.com
John D. Kinton (SBN 203250)
7 jkinton@jonesday.com
Kelly V. O'Donnell (SBN 257266)
8 kodonnell@jonesday.com
4655 Executive Drive, Suite 1500
9 San Diego, California 92121
Telephone: (858) 314-1200
10 Facsimile: (858) 345-3178

11 QUINN EMANUEL URQUHART &
SULLIVAN, LLP
12 David A. Nelson (*pro hac vice*)
(Ill. Bar No. 6209623)
13 davenelson@quinnemanuel.com
Stephen Swedlow (*pro hac vice*)
14 (Ill. Bar No. 6234550)
stephenswedlow@quinnemanuel.com
15 500 West Madison St., Suite 2450
Chicago, Illinois 60661
16 Telephone: (312) 705-7400
Facsimile: (312) 705-7401

17
Scott L. Watson (SBN 219147)
18 scottwatson@quinnemanuel.com
Valerie A. Lozano (SBN 260020)
19 valerielozano@quinnemanuel.com
865 South Figueroa Street, 10th Floor
20 Los Angeles, CA 90017
Telephone: (213) 443-3000
21 Facsimile: (213) 443-3100

22 Richard W. Erwine (*pro hac vice*)
(N.Y. Bar No. 2753929)
23 richarderwine@quinnemanuel.com
Alexander Rudis (*pro hac vice*
24 forthcoming)
(N.Y. Bar No. 4232591)
25 alexanderrudis@quinnemanuel.com
Patrick D. Curran (SBN 241630)
26 patrickcurran@quinnemanuel.com
51 Madison Avenue, 22nd Floor
27 New York, NY 10010
Telephone: (212) 849-7000
28 Facsimile: (212) 849-7100

Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Michelle A. Clark (SBN 243777)
michelleclark@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (*pro hac vice*)
(N.Y. Bar No. 1475722)
echesler@cravath.com
Keith R. Hummel (*pro hac vice*)
(N.Y. Bar No. 2430668)
khummel@cravath.com
Richard J. Stark (*pro hac vice*)
(N.Y. Bar No. 2472603)
rstark@cravath.com
Gary A. Bornstein (*pro hac vice*)
(N.Y. Bar No. 2916815)
gbornstein@cravath.com
J. Wesley Earnhardt (*pro hac vice*)
(N.Y. Bar No. 4331609)
wearnhardt@cravath.com
Yonatan Even (*pro hac vice*)
(N.Y. Bar No. 4339651)
yeven@cravath.com
Vanessa A. Lavely (*pro hac vice*)
(N.Y. Bar No. 4867412)
vlavely@cravath.com
Antony L. Ryan (*pro hac vice*)
(N.Y. Bar. No. 2784817)
aryan@cravath.com
David R. Marriott (*pro hac vice*)
(N.Y. Bar. No. 2682565)
dmarriott@cravath.com
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

JODIE W. CHENG, P.C.
Jodie W. Cheng (SBN 292330)
jwcheng@jwc-legal.com
One Market Street
Spear Tower, 36th Floor
San Francisco, CA 94105
Telephone: (415) 293-8308

Case 3:17-cv-00525-MN   Document 269-4   Filed 06/07/24   Page 103 of 103 PageID #: 32
Case 3:17-cv-01375-DMS-MDD   Document 504   Filed 12/26/18   PageID.23495   Page 102 of
11493

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Attorneys for Plaintiff and*
*Counterclaim Defendants*
*QUALCOMM INCORPORATED and*
*QUALCOMM TECHNOLOGIES, INC.*